Donald H. and Pat SMITH, Appellants,

v.

Ronald Mitchell and Serena LEVINE, Appellees.

No. 04–94–00241–CV.

Court of Appeals of Texas, San Antonio.

Sept. 13, 1995.

Rehearing Overruled Oct. 27, 1995.

428

Nelson Skinner, Law Offices of Nelson Skinner, San Antonio, for Appellants.

Barry Snell, Bayne, Snell & Krause, P.C., San Antonio, for Appellees.

Before RICKHOFF, HARDBERGER and DUNCAN, JJ.

DUNCAN, Justice.

The Smiths appeal a judgment against them, and in favor of the Levines, under the Texas Deceptive Trade Practices Act. In eleven points of error, the Smiths argue that they cannot be held liable for representing to the Levines that the house they sold to them was in "excellent" condition when the Smiths knew at the time that an engineer had previously determined that the foundation was defective. We hold that the evidence adequately supports the jury's findings that the Smiths' knowing concealment and affirmative misrepresentation of material facts regarding the condition of the house were a producing cause of damages—including mental anguish damages—to the Levines. We further hold that, in these circumstances, the "as is" clause in the parties' earnest money contract is unenforceable as a matter of law.

In a single cross-point, the Levines argue that the trial court's award of attorney's fees is erroneous under this court's opinion in *Benefit Trust Life Ins. Co. v. Littles,* 869 S.W.2d 453 (Tex.App.—San Antonio 1993), *writs granted and judgment set aside without reference to the merits,* 873 S.W.2d 704 (Tex.1994). We decline to extend the reasoning in *Benefit Trust* to attorney's fees awards under the DTPA. For these reasons, we affirm.

### FACTS

This case arises out of the sale of a house by the Smiths to the Levines in 1991. The house, which was next door to the Smiths' home, was occupied by Mrs. Smith's mother from 1981 until 1988; thereafter, the house was completely remodeled and then leased to Monte Grissom. In 1989, when Grissom was considering purchasing the house, he hired Jim Bradley of American Engineering to do a mechanical and foundation analysis. On January 23, 1989, in his written report to the Grissoms, Bradley stated, in relevant part, that the foundation of the house "has deflected to the extent that it has damaged the superstructure and therefore the foundation is defective." Grissom discussed the report with Mr. Smith and even offered to give him a copy of Bradley's report in exchange for Mr. Smith paying one-half of Bradley's fee. Mr. Smith declined, stating that "[t]he foundation report that you mention would have no value to us as we do not plan to put any additional money into the house prior to selling it." Because of the defective foundation, the Grissoms decided against buying the house.

Thereafter, the Smiths listed the house with a real estate agent. They did not, however, mention the defective foundation on the agent's questionnaire. When the agent failed to produce a purchaser, the Smiths put the house on the market themselves—running newspaper advertisements and distributing brochures describing the house as be-

ing in "excellent" condition. In response to one of these newspaper advertisements, the Levines became interested in the house. Although the Levines observed minor cracks and a slight slope to the floor in one area of the house, Mr. Smith assured them that the cracks were superficial and routine for a house in that area. At no time did the Smiths inform the Levines that Bradley had determined that the foundation was defective. Nor was the defective foundation picked up by Henri Leonidov, an engineer hired by the Levines to do a "walk through" inspection. Instead Leonidov's report stated that the cracks were minor and superficial. The Levines ultimately purchased the house for the Smiths' full asking price, paying $25,000 at closing and giving the Smiths a promissory note, secured by the house, for the balance.

In late 1992, the Levines had financial difficulties and decided to sell the house to pay off their debts. They obtained a second report from Leonidov, which was similar to the first, and listed the house with a realtor. The Levines disclosed to the realtor the existence of what they thought were nonstructural cracks. In early 1993, the Levines contracted to sell the house to David Holmes. Although they gave Holmes copies of both of Leonidov's reports, Holmes decided to hire his own inspector. By coincidence, Holmes hired Bradley. Upon learning that Bradley had earlier determined that the foundation was defective, Holmes demanded the return of his earnest money and termination of the contract. The Levines immediately complied.

Upon reviewing Bradley's report, the Levines hired an attorney and made demand on the Smiths. The Smiths responded by hiring their own attorney, who accelerated the balance due on the promissory note and attempted to foreclose on the house. A restraining order and later a temporary injunction prevented the Smiths' attempt to foreclose on the Levines' home pending trial.

The jury found that the Smiths knowingly engaged in a false, misleading or deceptive act or practice, as well as an unconscionable action or course of action, and both were a producing cause of damages to the Levines.

The jury also found that the Smiths had knowingly or intentionally committed fraud. The jury found the difference in value of the house as represented and received to be $33,800 and that the Levines should receive $14,400 each for their mental anguish. Finally, the jury assessed punitive damages in the amount of $65,000 against Mr. Smith and $32,750 against Mrs. Smith and found the attorney's fees reasonably incurred by the Smiths and the Levines as dollar amounts and, as to the Levines, as a percentage of their recovery.

In accordance with the Levines' election, the trial court totaled the recoveries of the Levines under the DTPA and the Smiths under their promissory note and offset the two against one another. The net recovery to the Levines was $81,792.62, together with postjudgment interest and costs. The Smiths appeal, seeking either rendition of judgment in their favor or, alternatively, a new trial. By cross-point, the Levines complain of the trial court's failure to award attorney's fees in accordance with this court's opinion in *Benefit Trust Life Ins. Co. v. Littles,* 869 S.W.2d 453 (Tex.App.—San Antonio 1993), *writs granted and judgment set aside without reference to the merits,* 873 S.W.2d 704 (Tex.1994).

## DECEPTIVE TRADE PRACTICE

In their first three points of error, the Smiths contend that there is legally and factually insufficient evidence to support the jury's findings that the Smiths knowingly committed a deceptive trade practice that was a producing cause of damage to the Levines. We have read the record in this case and reviewed these complaints under the well-established tests for legal and factual insufficiency. *See generally* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Texas L.Rev. 361, 361–68 (1960). Having done so, we believe there is ample evidence to support the jury's findings.

### Actual Knowledge

Under their first and second points of error, the Smiths argue that *Pfeiffer v. Ebby Halliday Real Estate,* 747 S.W.2d 887 (Tex.

App.—Dallas 1988, no writ), and similar cases mandate a holding that they cannot be held liable for knowingly failing to disclose information of which the Levines were or should have been equally aware. We cannot agree that the record supports the Smiths' factual premise.

By virtue of their awareness of Bradley's report, and Grissom's resulting refusal to purchase, the jury was entitled to find that the Smiths knew the foundation was defective by the time of the Smith–Levine transaction. This foundation problem was not simply a matter of "superficial" and "routine" cracks in interior walls or the slope in the floor—defects of which the Levines were made aware by their own visual inspection, as well as by Leonidov's report. Rather, the foundation problem arose out of a perimeter grade beam that had become so deflected as to damage the superstructure of the house. That is the information contained in Bradley's report, and that is the information the jury could reasonably have found the Smiths should have but did not disclose to the Levines. The Smiths' first and second points of error are overruled.

*Producing Cause*

Under their third point of error, the Smiths argue that under *Dubow v. Dragon*, 746 S.W.2d 857 (Tex.App.—Dallas 1988, no writ), and other similar cases they cannot be held liable for the Levines' damages because the Levines' inspections became the "sole efficient cause" of their damages. To avoid repetition, we consider this point along with the Smiths' eleventh point of error, under which the Smiths argue that the evidence is legally and factually insufficient to defeat their affirmative defense that the Levines waived all express and implied warranties.[1]

The Smiths' contentions arise out of certain provisions in the parties' earnest money contract, which was a modified version of a preprinted form promulgated by the Texas Real Estate Commission. This preprinted form, as modified, provided:

PROPERTY CONDITION (Check A or B)

☑ A. Buyer accepts the Property in its present condition, ~~subject only to any lender required repairs and~~ "AS IS"

☐ B. Buyer requires all inspections and repairs required by any lender and the Property Condition Addendum attached hereto.

The earnest money contract further provided that the Smiths made "no warranties, either express or implied, as to any matter whatsoever including without limitation, the condition of the home" and that "[n]o verbal contract or agreement contrary to any of the terms conditioned [sic] in the foregoing contract ha[d] been made." However, the earnest money contract did not indicate that these provisions survived the closing, nor were they continued or referenced in the Warranty Deed With Vendor's Lien given by the Smiths to the Levines at closing.

As indicated above, the jury did not find that the Smiths breached an express or implied warranty. Rather, the jury found that the Smiths committed a false, misleading, or deceptive act[2] and engaged in an unconscionable action or course of action. The waiver provisions might be effective to preclude a DTPA action for breach of warranty. *See La Sara Grain v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 565 (Tex. 1984). And they might also negate a finding of producing cause in some circumstances. *See Prudential Ins. Co. v. Jefferson Assoc.*, 896 S.W.2d 156 (1995). We do not believe, however, that they necessarily defeat a con-

---

1. Specifically, the Smiths complain that the trial court erred in failing to find, as a matter of law, that the parties' written contract waived all express and implied warranties; in failing to grant their motion for instructed verdict on the waiver issue; or, alternatively, in failing to submit the Smiths' proposed jury question inquiring whether the Levines in the exercise of reasonable diligence knew or should have known that they purchased a house without an express or implied warranty.

2. Specifically, the jury found that the Smiths either represented that the house was of a particular quality if it was of another or failed to disclose information about the house that was known at the time of the transaction with the intention to induce the Levines into the transaction.

sumer's cause of action for an affirmative misrepresentation encompassed by section 17.46(b) of the DTPA. *See First Title Co. of Waco v. Garrett,* 860 S.W.2d 74, 77–78 (Tex. 1993); *Weitzel v. Barnes,* 691 S.W.2d 598 (Tex.1985). On this ground alone, we believe the trial court could properly deny the Smiths' motion for instructed verdict and properly refuse to submit the Smiths' proposed jury question on waiver of express and implied warranties. The Smiths insist, however, that the law controlling the resolution of these points is set forth in the supreme court's recent decision in *Prudential.* We disagree.

In *Prudential,* Goldman sued his seller, Prudential, for failing to disclose that the conveyed property contained asbestos. *Prudential,* 896 S.W.2d at 159. The supreme court held that "Goldman's 'as is' agreement negate[d] his claim that any action by Prudential caused his injury." *Id.* at 161. Goldman's "as is" agreement provided:

> As a material part of the consideration for this Agreement, [Prudential] and [Goldman] agree that [Goldman] is taking the Property "AS IS" with any and all latent and patent defects and that there is no warranty by Seller that the Property is fit for a particular purpose. [Goldman] acknowledges that it is not relying upon any representation, statement or other assertion with respect to the Property condition, but is relying upon its examination of the Property. [Goldman] takes the Property under the express understanding there are no express or implied warranties (except for limited warranties of title set forth in the closing documents). Provisions of this Section 15 shall survive the Closing.

*Id.* at 160. However, the supreme court's decision in *Prudential* plainly rests upon a "valid 'as is' agreement." *Id.* at 161. Therefore, the court expressly noted that its holding was not intended to "suggest that an 'as is' agreement can have this determinative effect in every circumstance. A buyer is not bound by agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller." *Id.* at 162. To the contrary, the court expressly recognized that "other aspects of a transaction may make an 'as is' agreement unenforceable. The nature of the transaction and the totality of the circumstances surrounding the agreement must be considered." *Id.*

■ We believe the mandate of *Prudential* is to determine the validity of the "as is" agreement at issue in light of the sophistication of the parties, the terms of the "as is" agreement, and whether there was a knowing misrepresentation or concealment of a known fact.[3] A comparison of these factors in *Prudential* and this case, we believe, demonstrates the invalidity of the "as is" provision in the Smith–Levine earnest money contract as a matter of law:

- Goldman was "a knowledgeable real estate investor who owned an interest in at least thirty commercial buildings," the president of a commercial property management firm, and an "as is" purchaser of "several large investment properties." *Prudential,* 896 S.W.2d at 159. The Levines, on the other hand, were first-time home buyers.
- The "as is" clause at issue in *Prudential* expressly provided that Goldman was relying upon his own examination of the property and not upon any statement or assertion made by Prudential or its agents regarding the condition of the property. *Prudential,* 896 S.W.2d at 160. The "as is" clause in this case is silent on the reliance issue, and the Levines testified that they in fact relied on the Smiths' representations that the house was in "excellent" condition and believed the "as is" clause referred only to problems that might develop in the future.
- In *Prudential,* there was "no evidence that Prudential actually knew of the asbestos," *Prudential,* 896 S.W.2d at 162, and

---

**3.** The *Prudential* Court apparently determined that Goldman's "as is" clause was enforceable as a matter of law. However, while the court indicated that similar clauses might be unenforceable in different circumstances, it did not indicate whether enforceability presents a question of fact or law. We do not reach this issue in this case because we believe the evidence conclusively establishes the unenforceability of the Smiths' "as is" clause at least as to the Levines' causes of action for knowing misrepresentation and failure to disclose under the DTPA.

the alleged misrepresentations were "merely 'puffing' or opinion." *Id.* at 163. In this case, on the other hand, there is ample evidence that the Smiths knew the foundation of the home was defective at the time of the Smith–Levine transaction but they repeatedly assured prospective purchasers, including the Levines, that it was in "excellent" condition.

• The "as is" clause at issue in *Prudential* expressly provided that it would "survive the Closing." *Prudential*, 896 S.W.2d at 160. By using this language, Prudential avoided the general rule that contractual provisions are merged into the deed by which the property is conveyed at closing; therefore, Prudential could legitimately rely on the "as is" clause as a viable, post-closing defense to Goldman's allegations that Prudential misrepresented the condition of the property. *See Baker v. Baker,* 207 S.W.2d 244 (Tex.Civ.App.—San Antonio 1947, writ ref'd n.r.e.). In this case, on the other hand, neither the earnest money contract nor the deed contains any indication that the "as is" clause was intended to survive the closing, and the general rule would suggest that it did not.

For these reasons, we believe *Prudential* is not dispositive of this case. We believe this case is instead more closely analogous to *Weitzel,* in which the supreme court held that, "[e]ven under a contract allowing inspection," *Weitzel,* 691 S.W.2d at 601, a seller's oral misrepresentations regarding the condition of property "are not only admissible but can serve as the basis of a DTPA action." *Id.* at 600. As noted by the supreme court, the distinction between *Weitzel* and *Prudential* is whether the particular "as is" clause at issue negates producing cause as a matter of law in the circumstances presented. *See Prudential,* 896 S.W.2d at 164.

In short, we believe the "as is" clause in this case, like that in *Weitzel* and unlike that in *Prudential,* does not as a matter of law negate causation because the Smiths knowingly concealed material information and made affirmative oral misrepresentations to the Levines regarding the condition of the house; the Levines did not expressly and in writing disclaim their reliance upon these oral representations; and the Levines testified that, in purchasing the house, they did in fact rely upon the Smiths' oral misrepresentations. The Smiths' third and eleventh points of error are therefore overruled.

## NEWLY–DISCOVERED EVIDENCE

In their fourth point of error, the Smiths argue that the trial court erred in denying their motion for new trial because they presented newly-discovered evidence establishing that the Levines' expert witness, Tom F. McNeil, was not certified by the Texas Appraiser Licensing and Certification Board and had not submitted an application to become so certified. *See* TEX.REV.CIV.STAT. ANN. art. 6573a.2. (Vernon 1995).

The trial court's action on a motion for new trial is governed by an abuse of discretion standard. *Champion Int'l Corp. v. Twelfth Court of Appeals,* 762 S.W.2d 898, 899 (Tex.1988, orig. proceeding). To establish an abuse of discretion, the complaining party must demonstrate that the trial court acted unreasonably, arbitrarily, or without reference to guiding rules and principles. *Downer v. Aquamarine Operators,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). In the context of newly-discovered evidence, the guiding rules and principles are clear: At the very least, the movant must bring forward non-cumulative evidence of which the movant did not become aware, and could not with the exercise of diligence have become aware, until after trial, and this newly-discovered evidence must be so material that it would probably produce a different result. *Fish v. Bannister,* 759 S.W.2d 714, 722 (Tex.App.—San Antonio 1988, no writ); *see generally* W. Wendell Hall, *Revisiting Standards of Review in Civil Appeals,* 24 ST.MARY'S L.J. 1041, 1116–17 (1993) (citing, *e.g., Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983)).

The Smiths' evidence at the hearing on their motion for new trial fails to satisfy either prong of the newly-discovered evidence test. First, nothing in the record before us establishes or even suggests that the Smiths could not have discovered that McNeil was not certified by the Texas Ap-

praiser Licensing and Certification Board prior to trial. Additionally, whether McNeil was certified by the Board is patently immaterial. The Smith–Levine transaction was not a "federally related transaction"; therefore, McNeil was not required to be certified by the Board. *See and compare* TEX.R.CIV. EVID. 702 *with* TEX.REV.CIV.STAT.ANN. art. 6573a.2. (Vernon 1995). Contrary to the Smiths' argument, McNeil did not "mislead[ ] the court about his expert qualifications...." McNeil never represented to the court or the jury that he was certified by the Texas Appraiser Licensing and Certification Board; rather, he testified that he was a licensed real estate broker, and he had forty years of experience in the home building business and twenty-five years of experience in appraisal work. In a case such as this, Rule 702 requires no more.

The Smiths also argue under their fourth point of error that McNeil's testimony was based upon improper assumptions and conjecture. This is demonstrated, the Smiths argue, by testimony from their expert, Harrison, during the hearing on their motion for new trial. This may well be true, but it is an issue we need not decide. Once again the Smiths have failed to demonstrate either that they could not have discovered the alleged flaws in McNeil's methodology prior to trial or that any such flaw would probably have caused a different result. The Smiths' fourth point of error is overruled.

### STIGMA DAMAGES

■ In their fifth point of error, the Smiths argue that the trial court erred in overruling their objection to McNeil's testimony regarding diminution in the value of the home as a result of the stigma attached to the defective foundation. The Levines counter that this court has previously recognized and permitted stigma damages in *Terminix Int'l v. Lucci*, 670 S.W.2d 657 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.). We agree and overrule the Smiths' fifth point of error. *See Century 21 Page One Realty v. Naghad*, 760 S.W.2d 305, 309 (Tex.App.—Texarkana 1988, no writ); *Precision Homes, Inc. v. Cooper*, 671 S.W.2d 924, 929–30 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd

n.r.e.) (both permitting expert testimony regarding foundation problems adversely affecting property value); *cf. Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160 (Tex.1992); *Unitrust, Inc. v. Jet Fleet Corp.*, 673 S.W.2d 619 (Tex.App.—Dallas 1984, no writ) (both recognizing that out-of-pocket and benefit-of-the-bargain measures of damages are not exclusive if neither, standing alone, will make plaintiff whole).

### REFUSAL TO PERMIT INSPECTION

■ In their sixth point of error, the Smiths argue that the trial court erred in awarding penalty damages because the Levines unreasonably refused to permit the Smiths to inspect the premises. *See* TEX. BUS. & COM.CODE § 17.505 (Vernon 1995). We disagree.

Section 17.505 of the Texas Deceptive Trade Practices Act permits the defendant to make "a written request to inspect, in a reasonable manner and at a reasonable time and place...." If the plaintiff "unreasonably refuses to permit the inspection," section 17.505 precludes an award of penalty damages under section 17.50(b). In this case, in response to the Levines' DTPA demand letter, the Smiths sent a written request for additional information and an inspection, but they did not specify a time for the inspection. The Levines did not send a written reply. However, Mr. Levine testified at trial that he was at all times willing for the Smiths to inspect the property and never refused to permit an inspection. Additionally, the Levines' attorney testified that he made several attempts to schedule an inspection with the Smiths' attorney.

We believe the evidence at most raised a question of fact as to whether the Levines unreasonably refused to permit an inspection. Accordingly, since this defense is in the nature of an affirmative defense, *see* TEX. R.CIV.P. 94, it was waived by the Smiths' failure to request a jury question thereon. *See* TEX.R.CIV.P. 278–79; *Denton Pub. Co. v. Boyd*, 460 S.W.2d 881, 885 (Tex.1970). The Smiths' six point of error is overruled.

## MENTAL ANGUISH

In their seventh point of error, the Smiths argue that there is legally and factually insufficient evidence to support the jury's finding that the Levines suffered $28,800 in mental anguish damages. We review these complaints under the well-established tests for legal and factual insufficiency. *See generally* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEXAS L.REV. 361, 361–68 (1960).

■ A knowing violation of the Texas Deceptive Trade Practices Act is necessary to support an award of damages for mental anguish. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 435 (1995) (citing *Luna v. North Star Dodge Sales Inc.*, 667 S.W.2d 115, 117–18 (Tex.1984)). However, a plaintiff must also present either "direct evidence of the nature, duration, and severity of their mental anguish" or other evidence that is legally and factually sufficient to establish " 'a high degree of mental pain and distress' " that is " 'more than mere worry, anxiety, vexation, embarrassment, or anger' " or, alternatively, an event "beyond the vicissitudes of daily life" from which the jury could reasonably infer mental anguish. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 445 n. 10 (1995) (quoting *J.B. Custom Design & Bldg. v. Clawson*, 794 S.W.2d 38, 43 (Tex.App.—Houston [1st Dist.] 1990, no writ)).

■ In *Parkway Co.*, the supreme court held that there was no direct evidence of the nature, duration, and severity of the plaintiffs' alleged mental anguish and, further, that the plaintiffs' testimony that the flooding of their house was "upsetting" was legally insufficient to support the jury's award of mental anguish damages. *Id.* at 445. Additionally, the court held that the jury could not reasonably infer mental anguish because the event—the flooding of the plaintiffs' home—"cannot be said to be beyond the vicissitudes of daily life." *Id.* at 445 n. 10.

In this case, we believe the undisputed evidence establishes an event well beyond "the vicissitudes of daily life"—two threatened foreclosures and loss of the Levines' home, prevented only by virtue of a temporary restraining order issued three days before the date of the foreclosure sale and a subsequent temporary injunction. These threats made Mrs. Levine "sick" and caused her to be "scared to death, just afraid they'd take the house, afraid [she] wouldn't have a roof over [her] family's head." Indeed, at one point during her testimony, Mrs. Levine broke into tears. Mr. Levine also testified to the "extreme emotional effect" caused by the Smiths' foreclosure attempts and the fear caused by these threats, coupled with their attorney's inability to assure them either that he could prevent the foreclosure sale or that he could keep the bond at an affordable amount. It was all the Levines talked about; it consumed their waking hours. These fears were exacerbated by the fact that the Levines had no viable alternate living arrangements if a foreclosure occurred. Additionally, the evidence establishes that when the Smiths sent an inspector to the Levines' home without warning, Mrs. Levine was "terrified," and her husband was "upset," because their young daughter, Mrs. Levine's invalid father, and their housekeeper were all "defenseless." Finally, during trial, the taxing authorities sued to collect the unpaid back taxes. In short, the Levines believed the Smiths were trying to put the Levines "out on the street," and the Levines were terrified that they would lose their home and have no place to live.

After a careful review of the record under the appropriate standards of review, we believe the evidence is legally and factually sufficient to support the jury's mental anguish damage findings. *Cf. LaCoure v. LaCoure*, 820 S.W.2d 228, 234 (Tex.App.—El Paso 1991, writ denied) (affirming $100,000 in damages for physical discomfort, pain, and emotional distress caused by wrongful threatened eviction and eviction). The Smiths' seventh point of error is overruled.

## DIFFERENCE IN VALUE

■ In their eighth point of error, the Smiths contend the evidence is legally and factually insufficient to support the jury's finding of $33,800 as the difference in value of the house as represented and the house as it was received. Again, we review these complaints under the well-established tests

for legal and factual sufficiency review. *See generally* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEXAS L.REV. 361, 361–68 (1960).

The Smiths argue that "[n]o witness testified at trial to any actual value of the house that was less than the actual purchase price on the date of purchase of the house." The record does not support the Smiths' argument. Mr. Levine, as well as the Levines' expert, testified that a defective foundation caused the value of a home to diminish a minimum of twenty percent or, in this case, $33,800. Contrary to the Smiths' assertion, McNeil's testimony in this regard was not restricted to a point in time after the Smith–Levine transaction; rather, it was a general rule of thumb. Additionally, Mrs. Levine testified that she believed that, at the time of the sale, the defective foundation caused the house to be worth approximately $50,000 less than they paid for it. The Smiths introduced no evidence controverting the $33,800–$50,000 range established by the Levines' evidence.

In light of the uncontroverted testimony establishing diminution in value in the $33,800–$50,000 range, we believe the evidence is legally and factually sufficient to support the jury's finding. *See Precision Homes v. Cooper,* 671 S.W.2d 924, 929–30 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). The Smiths' reliance upon *Odom v. Meraz,* 810 S.W.2d 241 (Tex.App.—El Paso 1991), *writ denied per curiam,* 835 S.W.2d 626 (1992), in which there was no evidence of value at the time of purchase, is misplaced. The Smiths' eighth point of error is overruled.

## ADMISSIBILITY OF PHOTOGRAPHS

In their ninth point of error, the Smiths contend that the trial court reversibly erred in overruling their objection to the introduction of photographs taken of the foundation in 1993 because (1) the photographs were not relevant since they did not reflect the condition of the foundation at the time of the 1991 Smith–Levine transaction and (2) the photographs were not produced in discovery.

■ The record indicates that the Smiths objected to introduction of the photographs only on the ground that "the issue in this case is what the condition of the foundation [was] in 1991, not last Sunday." Accordingly, the argument that the photographs were not produced in discovery was waived. *See* TEX.R.APP.P. 52(a); *In the Matter of Bates,* 555 S.W.2d 420, 432 (Tex.1977). Moreover, the photographs were merely cumulative of Mr. Levine's testimony regarding his inspection of the foundation. Accordingly, the error, if any, was harmless. *See, e.g., Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 230 (Tex.1990). The Smiths' ninth point of error is therefore overruled.

## DAMAGE AND ATTORNEY'S FEES CALCULATIONS

In a supplemental brief filed without leave of court or explanation almost two months after their original brief was filed, the Smiths attempted to raise a new point of error regarding the calculations of actual damages and attorney's fees. In the absence of any explanation, we decline to grant leave. *See Alvarado v. State,* 818 S.W.2d 100, 106 (Tex. App.—San Antonio 1991, no pet.). Even were we to permit such a late-filed point of error, however, it would be unavailing because the Smiths failed to preserve the alleged error in a postjudgment motion in the trial court, *see* TEX.R.APP.P. 52(a), and, in any event, the trial court's calculations regarding actual damages and attorney's fees conform to established precedent. *See, e.g., McKinley v. Drozd,* 685 S.W.2d 7 (Tex.1985) (calculation of attorneys' fees); *Acco Constructors, Inc. v. National Steel Products Co.,* 733 S.W.2d 368, 371–72 (Tex.App.—Houston [14th Dist.] 1987, no writ) (offsetting defendant's entire recovery against consumer's entire recovery).

## ATTORNEY'S FEES UNDER BENEFIT TRUST

■ In a single cross-point, the Levines argue that the trial court erred in computing their attorney's fees as a simple one-third of their damages, rather than under the formula set forth in *Benefit Trust Life Ins. Co. v. Littles,* 869 S.W.2d 453 (Tex.App.—San Anto-

nio 1993), *writs granted and judgment set aside without reference to the merits,* 873 S.W.2d 704 (Tex.1994).

In *Benefit Trust,* this court held that, under section 16(b)(1) of article 21.21 of the Texas Insurance Code, a jury question inquiring as to attorney's fees as a percentage of *recovery* entitled a prevailing plaintiff to attorney's fees in an amount greater than the same percentage applied to the plaintiff's damages. *Benefit Trust,* 869 S.W.2d at 472. Effectively, the court reasoned that, where there is a one-third contingent fee contract, the jury's damage awards represent only two-thirds of the plaintiffs damages; the plaintiff's total damages are the damage awards plus the attorney's fee award, and the one-third attorney's fee award is to be calculated on this total. The actual holding in *Benefit Trust* of course governs only those cases in which attorney's fees are awarded pursuant to article 21.21. Accordingly, the issue before us is whether to extend the reasoning in *Benefit Trust* to cases in which attorney's fees are awarded pursuant to the DTPA.

In *Benefit Trust,* the court adopted the method of calculating article 21.21 attorney's fees previously employed by the Austin Court of Appeals in *Great American Ins. Co. v. North Austin M.U.D.,* 850 S.W.2d 285, 291 (Tex.App.—Austin 1993), *aff'd in part and rev'd in part,* 908 S.W.2d 415 (1995). That method has now been expressly disapproved by our supreme court because it "essentially inflates the award of attorneys' fees...." *Great American,* 908 S.W.2d at 428; *see also Goodyear Tire & Rubber Co. v. Portilla,* 836 S.W.2d 664, 671–72 (Tex.App.—Corpus Christi 1992), *aff'd,* 879 S.W.2d 47 (Tex.1994) (method "has the effect of awarding attorney's fees on attorney's fees" and awards fees in excess of what the jury found was reasonable).

By its terms, this aspect of *Great American* is limited only to attorney's fee awards in contract cases governed by section 38.001 of the Texas Civil Practices and Remedies Code. *Great American,* 908 S.W.2d at 428. We believe, however, that the court's reasoning extends to cases such as this under the DTPA. We therefore decline to extend *Ben-*

*efit Trust* and overrule the Levines' cross-point. We do not decide whether *Benefit Trust* survives in cases in which attorney's fees are awarded pursuant to article 21.21 of the Texas Insurance Code.

The Smiths' points of error, as well as the Levines' cross-point, are overruled, and the judgment is affirmed.