



# MEMORANDUM OPINION

No. 04-10-00375-CV

Norris J. **DEVOLL**,
Appellant

v.

Rebecca **DEMONBREUN** and William Dowds,
Appellees

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-CI-10538
Honorable Solomon Casseb, III, Judge Presiding

Opinion by:  Phylis J. Speedlin, Justice

Sitting:  Phylis J. Speedlin, Justice
Rebecca Simmons, Justice
Steven C. Hilbig, Justice

Delivered and Filed:  March 21, 2012

AFFIRMED

Norris J. DeVoll appeals a judgment rendered against him, and in favor of Rebecca

Demonbreun and William Dowds, under the Texas Deceptive Trade Practices-Consumer

Protection Act (DTPA). Because we conclude the evidence is sufficient to support the jury's

findings, we affirm the judgment of the trial court.

**FACTS**

This case arises out of the sale of a home and adjoining piece of property by DeVoll to Demonbreun and Dowds in 2007. Because Demonbreun and Dowds prevailed at trial, we view the evidence in the light most favorable to them. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 159 (Tex. 1995). DeVoll purchased the residence at 3311 Kaiser Street and the adjacent vacant lot at 3315 Kaiser Street through a probate proceeding on August 31, 2005 without ever seeing the inside of the house. DeVoll is a real estate investor who has bought and sold about 50 properties in the last ten to fifteen years, often through court proceedings. This particular home was built in the 1950's and was in a state of disrepair. When DeVoll purchased the property, the prior owner's son, Jack Buck, was living on the premises and refused to leave. Buck had filed a mechanic's lien on the home and also claimed that his mother left the house to him. DeVoll sued to evict Buck and was ultimately successful in establishing his ownership of the house and the adjacent lot. In connection with the eviction litigation, DeVoll visually inspected the home in an effort to document any damage caused by Buck. In May 2006, DeVoll began work to clean up the premises and ready the property for resale. It was placed on the market in October 2006 at the price of $92,000.

In May of 2007, Dowds drove by the Kaiser Street properties and thought they might be suitable for him and his girlfriend, Demonbreun. A few days later, Dowds, and his realtor, John Woods, walked through the house to examine it. Dowds noted that the house was clean and freshly painted, and smelled good and looked good. Thereafter, Dowds, Woods, Demonbreun, and DeVoll toured the house together. DeVoll told them that it was "a sound house" and if there were any minor defects, he would take care of them. DeVoll told Dowds that the air conditioner, which was installed on top of the flat metal roof, was missing parts and that he would either

replace them or install a new unit. DeVoll stated that the air conditioner had been vandalized and that all of the copper had been stripped out, resulting in leaks through the area where the intact air conditioner used to be. DeVoll also told Dowds that the hot water in the kitchen was not working because a valve needed to be replaced, and said that he would take care of the matter. Finally, DeVoll told Dowds and Demonbreun that the window frames had been recently painted, and that removing the paint with a straight edge would allow them to open the windows. Dowds asked DeVoll if there was anything wrong with the house and if there were any restrictions on the property. DeVoll replied that there was nothing wrong with the house and that there were no restrictions. DeVoll told Demonbreun that it was a nice house and in good shape.

A few days later, on May 22, 2007, Demonbreun[1] made an offer to purchase the house and adjacent lot for $89,000. The offer to purchase the property is titled "One to Four Family Residential Contract (Resale)," and is a form contract promulgated by the Texas Real Estate Commission (TREC). The contract was filled out by Woods, who was a realtor with Don Johnson Real Estate Company. Section 7 of the contract pertains to the condition of the property; subsection 7(B)(3) provides three options relative to the seller's disclosure notice. Option 3 states that the seller is not required to furnish the notice under the Texas Property Code. Woods checked Option 3, in reliance on DeVoll's statement that he was not required to provide the disclosure notice because he acquired the property through probate and had never lived in the house.

Subsection 7(D) of the contract, titled "Acceptance of Property Condition," provides that, "**Buyer accepts the Property in its present condition; provided Seller, at Seller's expense, shall complete the following specific repairs and treatments: <u>HVAC System will be made</u>**

---

[1] Although Demonbreun and Dowds intended to live in the house together, only Demonbreun's name appeared on the contract in order to obtain more favorable financing terms.

**operational prior to closing.**" (emphasis added). The underlined language was handwritten by Woods.

The contract also contained a standard inspection clause and termination option. On May 27, 2007, within the five-day option period, Demonbreun had the property inspected by her friend, John Blanco, a licensed contractor. Blanco inspected the property and produced a list of a dozen repairs desired by the buyers. DeVoll made the repairs.[2] Before closing on the house, Demonbreun and Dowds moved their mobile home onto the adjacent vacant lot. DeVoll gave them the lockbox code and allowed them to use the restroom in the house while they stayed in the mobile home.

The sale of the properties closed on June 7, 2007. After Demonbreun and Dowds moved into the house, they discovered numerous problems. The first time they turned on the stove, they could hear gas leaking out of the gas pipe. DeVoll sent a handyman to attempt a repair, but the gas lines remained corroded. In late June, after a heavy rainstorm, water leaked in beneath the newly installed air conditioning unit. In addition, the flat metal roof leaked into the living room and bedrooms. Heavy acoustic had been sprayed on the ceilings where these leaks occurred. DeVoll sent workmen over on at least two occasions to repair the leaks, but the leaks persisted. Demonbreun and Dowds also discovered a serious plumbing leak in a wall near the kitchen. Upon removing the wall to expose the leak, Dowds discovered what appeared to be a longstanding leak based on the extensively damaged wood near the leak and a poor attempt to repair the problem. When Demonbreun called her homeowner's insurance about fixing the plumbing leak, they refused to pay, stating that it was a pre-existing condition. Demonbreun stated that they realized there was a plumbing leak when they smelled raw sewage and noticed

---

[2] Demonbreun testified at trial that none of the items which are the subject of the complaints in the lawsuit were contained in Blanco's inspection list.

damp carpet in the office. In the backyard they noticed "green slime" along the bottom of the house. They tore open a wall in the kitchen and pulled off sheet rock to find a busted pipe. It was apparent that someone had recently attempted to repair the pipe because there was brand new sheet rock and cement around the pipe.

Other problems with the house included a leaking Jacuzzi and windows that had been rusted shut rather than painted shut. Although DeVoll had agreed to replace a valve to get the hot water running in the kitchen, his repair attempts failed. In order to wash dishes, Demonbreun and Dowds had to carry in hot water from the bathroom. They received an estimate from a plumber to fix the problem, which was over $10,000 and required rerouting the plumbing outside. The hot water heater also did not work, but DeVoll replaced it with a functioning unit.

After Dowds and Demonbreun had lived on the property for a month or two, the City of San Antonio Code Enforcement Services notified them that they were in violation of residential zoning restrictions and demanded that they remove the mobile home that was parked on the adjacent lot and that they remove the privacy fence that Dowds had built along the boundaries of the vacant lot. About a year after moving in, Demonbreun and Dowds were also visited by Jack Buck, the holdover tenant who had been evicted by DeVoll. Buck told them that there used to be a gas pump on the adjacent lot and that a large gas storage tank was buried underground and had never been removed. Prior to his eviction, Buck had informed DeVoll about the underground tank and showed him a small pipe filled with dirt sticking out of the ground on the adjacent lot. Demonbreun stated that she was concerned about the alleged gas tank because it could be a health hazard, and that she could not afford to remove the tank, given that the estimates she received ranged from $10,000 to dig the tank up to over $100,000 to dispose of the tank.

Demonbreun and Dowds notified DeVoll of the various problems with the house and he sent workmen over to attempt repairs. Dowds claimed that DeVoll consistently sent unlicensed and incompetent repairmen and therefore he decided to stop complaining about the defects to DeVoll. Thereafter, Demonbreun and Dowds had the property inspected by Christopher Stein, a home builder and developer with over thirty years of experience in the construction industry. Stein prepared a report detailing the home's defects, deficiencies, and building code violations, and opined that the necessary repairs would exceed $100,000. In his report, Stein opined that "substandard work was performed on [the] house prior to purchase of the home by Mrs. [Demonbreun] for the purpose of concealing serious defects of the home."

In March of 2009, Demonbreun and Dowds moved out of the house, frustrated that the numerous defects would cost more to repair than the property was worth. Demonbreun and Dowds subsequently sued DeVoll for violations of the DTPA, alleging that DeVoll failed to provide the seller's disclosure notice required by law, misrepresented the condition of the home, misrepresented that he would repair numerous defects with the home, and failed to disclose information known about the house for the purpose of inducing them to purchase the property.[3] Demonbreun also alleged that she suffered mental anguish as a result of DeVoll's false, misleading, and deceptive acts. Ultimately, the case was submitted on the DTPA causes of action only. The jury found that (1) DeVoll engaged in false, misleading, or deceptive act(s) or practice(s)[4] that Demonbreun and Dowds relied on to their detriment and that was a producing

---

[3] Demonbreun and Dowds also sued John Woods, their realtor, and Don Johnson Real Estate Company, but proceeded to trial against DeVoll alone.

[4] The charge defined a false, misleading, or deceptive act or practice as: "a) Failing to disclose information about the properties in question that was known by Norris J. DeVoll at the time of the transaction with the intention to induce Rebecca Demonbreun and William Dowds into a transaction they would not have entered into if the information had been disclosed; b) Misrepresenting that the properties in question were of a particular standard, quality, or grade, if they are of another; or c) Misrepresenting that the properties in question had characteristics, uses, or benefits which they do not have."

cause of damages to Demonbreun and Dowds; (2) DeVoll engaged in an unconscionable action or course of action that was a producing cause of damages to Demonbreun and Dowds; and (3) DeVoll engaged in such conduct knowingly and/or intentionally. The trial court entered judgment on the jury's verdict and awarded Demonbreun and Dowds $114,721.00, plus prejudgment interest and attorney's fees. This appeal followed.

## DISCUSSION

DeVoll challenges the trial court's judgment in three issues, contending (1) he is entitled to judgment as a matter of law because the "as is" clause in the residential sales contract eliminates the causation necessary for the buyers to recover under the DTPA; (2) there is no evidence, or at least insufficient evidence, that he engaged in an unconscionable action by taking advantage of the buyers' lack of knowledge, ability, or capacity to a grossly unfair degree; and (3) there is factually insufficient evidence that Demonbreun suffered mental anguish and to support the amount of mental anguish damages awarded to her.

### I. *Causation*

In his first issue, DeVoll contends that he is entitled to judgment as a matter of law because the "as is" clause in the parties' residential sales contract negates the causation necessary for Demonbreun and Dowds to recover under the DTPA.

### *Standard of Review*

We review legal questions that rest on a factual basis de novo, while affording deference to the jury's fact findings. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011); *Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.*, 227 S.W.3d 46, 50 (Tex. 2007) ("Appellate courts review legal determinations de novo, whereas factual determinations receive more deferential review based on the sufficiency of the evidence.").

*Applicable Law*

Under the DTPA, a consumer may bring suit against any person whose violation of the Act is a producing cause of the consumer's harm. TEX. BUS. & COM. CODE ANN. § 17.50(a)(1), (3) (West 2011). Producing cause requires "some evidence that the defendant's act or omission was a cause in fact of the plaintiff's injury." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 502 (Tex. 2001). DeVoll argues that *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156 (Tex. 1995), controls the outcome of this case. We thus begin by analyzing *Prudential.*

**Prudential Insurance Co. v. Jefferson Associates, Ltd.**

The facts in *Prudential* are relatively straightforward. Goldman, a knowledgeable real estate investor, purchased a commercial building from Prudential "as is" after conducting his own inspection of the property. *Id.* at 159. Subsequently, Goldman sued Prudential alleging violations of the DTPA, fraud, negligence and breach of the duty of good faith and fair dealing. *Id.* at 160. Goldman claimed Prudential misrepresented the condition of the building during the negotiation process and failed to disclose the building contained asbestos, a condition which lowered the value of the property. *Id.* Prudential responded that Goldman was precluded from recovering under the DTPA because the sales contract contained an explicit "as is" clause which provided:

> As a material part of consideration for this Agreement, Seller and Purchaser agree that Purchaser is taking the Property "AS IS" with any and all latent and patent defects and that there is no warranty by Seller that the Property is fit for a particular purpose. Purchaser acknowledges that it is not relying upon any representation, statement or other assertion with respect to the Property condition, but is relying upon its examination of the Property. Purchaser takes the Property under the express understanding there are no express or implied warranties (except for limited warranties of title set forth in the closing documents). Provisions of this Section 15 shall survive the Closing.

*Id*. at 159-60.  Goldman prevailed at trial and the supreme court granted review to decide "whether a buyer who agrees, freely and without fraudulent inducement, to purchase commercial real estate 'as is' can recover damages from the seller when the property is later discovered not to be in as good a condition as the buyer believed it was when he inspected it before the sale." *Id*. at 158-59.

The supreme court began its analysis by noting that all of Goldman's causes of action required proof that Prudential had caused his injuries.  *Id*. at 160-61.  The court then focused on whether Goldman's "as is" agreement established that Prudential could not have been a producing cause of his harm.  *Id*. at 161, 164.  Relying on *Mid Continent Aircraft Corp. v. Curry County Spraying Serv. Inc.*, 572 S.W.2d 308, 313 (Tex. 1978), the supreme court held that by agreeing to purchase the property "as is," the buyer agrees to make his own assessment of the bargain and accepts the risk that he may be wrong.  *See Prudential*, 896 S.W.2d at 161.  The court also relied on section 2.316(c)(1) of the Texas Business and Commerce Code, noting that with an "as is" agreement, the seller gives no assurances, express or implied, concerning the value or condition of the thing sold.  *Id*.; TEX. BUS. & COM. CODE ANN. § 2.316(c)(1) (West 2009).  The court specifically held that a "valid 'as is' agreement, like the one in the [*Prudential*] case, prevents a buyer from holding a seller liable if the thing sold turns out to be worth less than the price paid because it is impossible for the buyer's injury on account of this disparity to have been caused by the seller."  *See Prudential*, 896 S.W.2d at 161-62.

Although the "as is" agreement in *Prudential* negated the element of causation necessary for Goldman's claims, the supreme court expressly cautioned that not all "as is" agreements will have this preclusive effect.  *Id.* at 162.  The court recognized, "[a] buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent

representation or concealment of information by the seller." *Id.* "Also, a buyer is not bound by an 'as is' agreement if he is entitled to inspect the condition of what is being sold but is impaired by the seller's conduct." *Id.* Furthermore, "other aspects of a transaction may make an 'as is' agreement unenforceable. The nature of the transaction and the totality of the circumstances surrounding the agreement must be considered." *Id.* (noting that where "as is" clause is an important basis of the bargain and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on the seller's representations should be given effect). In summary, as we have previously held, "the mandate of *Prudential* is to determine the validity of the 'as is' agreement at issue in light of the sophistication of the parties, the terms of the 'as is' agreement, and whether there was a knowing misrepresentation or concealment of a known fact." *Smith v. Levine*, 911 S.W.2d 427, 432 (Tex. App.—San Antonio 1995, writ denied).

### *Application*

Turning to the case before us, we must determine whether the "as is" clause in the real estate contract between DeVoll and Demonbreun is enforceable. *See Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 n.10 (Tex. 2007) (citing *Prudential*, 896 S.W.2d at 162). Demonbreun and Dowds argue that it is not enforceable because there is ample evidence of misrepresentations and failures to disclose by DeVoll that induced them to purchase the property and inhibited their ability to inspect the property. They contend this "is especially true in light of DeVoll's relative sophistication and the boilerplate nature of the clause in question." Additionally, Demonbreun and Dowds maintain that DeVoll induced them to enter into a contract which "waived" the seller's disclosure notice by telling their realtor that he was not

required to provide the notice because he acquired the house through probate and had never lived in the house.

DeVoll counters that the clause was proposed by the buyers, and that it was negotiated between the parties, as evidenced by the handwritten language requiring DeVoll to repair the HVAC system. He also argues that the parties were of relatively equal bargaining position, given that the buyers approached DeVoll to purchase the property and that they were represented by an experienced realtor. He further argues that Demonbreun and Dowds cannot complain about omissions because when they made their offer to buy the property—which DeVoll accepted—they chose to waive the seller's disclosure notice.[5]

We begin by noting that the provision at issue states that Demonbreun accepted the property "in its present condition," subject to the HVAC repair. While the parties do not dispute that this language has been held to constitute an "as is" agreement, *see Cherry v. McCall*, 138 S.W.3d 35, 39 (Tex. App.—San Antonio 2004, pet. denied), and *Boehl v. Boley*, No. 07-09-0269-CV, 2011 WL 238348, at *2 (Tex. App.—Amarillo Jan. 26, 2011, pet. denied) (mem. op.) ("[A] TREC contract using the language 'in its current condition' has been construed to be an 'as is' agreement."), the clause is not as explicit or detailed as that in *Prudential* and is entirely silent on the issue of reliance. *Cf. Prudential*, 896 S.W.2d at 160 ("as is" clause provided that the buyer was relying on his own examination of the property and not upon any statement or assertion made by the seller regarding the condition of the property); *see also Smith*, 911 S.W.2d at 432 (holding, in part, that an "as is" clause that is silent on the issue of whether the buyer will

---

[5] DeVoll additionally argues that he is entitled to a reversal because Demonbreun and Dowds failed to plead, prove, and submit to the jury affirmative defenses to the "as is" clause. We disagree. Demonbreun and Dowds did allege in their pleadings that DeVoll concealed or failed to disclose material facts within his knowledge, and that he intended to induce them to enter into the sale by such concealment or failure to disclose.

rely on the seller's statements cannot negate causation as a matter of law); *Pairett v. Gutierrez*, 969 S.W.2d 512, 517 (Tex. App.—Austin 1998, pet. denied) (same).

We also recognize that the record contains no evidence that either party discussed paragraph 7D, although it is undisputed that Woods added the handwritten language "HVAC System will be made operational prior to closing" to the contract he submitted to DeVoll on behalf of Demonbreun and Dowds. *See Kupchynsky v. Nardiello*, 230 S.W.3d 685, 691 (Tex. App.—Dallas 2007, pet. denied) (holding, in part, that a similar clause in a standard preprinted residential sales contract did not negate causation as a matter of law because the clause was not an "important basis of the bargain" where the buyer testified that the provision was neither discussed nor negotiated).

We next examine the evidence to determine whether DeVoll made any fraudulent representations to Demonbreun and Dowds in order to induce them to enter into the "as is" agreement. *See Prudential*, 896 S.W.2d at 162; *see also Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479 (Tex. 1995). The elements of fraud are:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Italian Cowboy Partners*, 341 S.W.3d at 337 (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)). "Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy Partners*, 341 S.W.3d at 337 (quoting *Smith v. KNC Optical, Inc.*, 296 S.W.3d 807, 812 (Tex. App.—Dallas 2009, no pet.)).

At trial, Demonbreun and Dowds argued they were induced to buy the property by DeVoll's fraudulent representations about the condition of the house. Initially, we do not agree that DeVoll's statements describing the house as "nice" and "sound" amount to misrepresentations of material fact. As *Prudential* noted, statements by a seller describing a building as "superb", "super fine", and "one of the finest little properties in the City of Austin" are "puffing" or opinion, and cannot constitute fraud. *Prudential*, 896 S.W.2d at 163. Demonbreun and Dowds also contend that DeVoll misrepresented that he would properly install a new HVAC system and fix the hot water in the kitchen. Again, we disagree that DeVoll's promises with respect to these items amount to fraudulent representations made to induce Demonbreun and Dowds to enter into the "as is" agreement. The record shows that, even though it continued to leak, DeVoll did in fact install a new HVAC system and that he sent various repairmen who attempted to repair the roof, the gas pipe, and the hot water problem in the kitchen. Because there is no evidence in this record that DeVoll's promises to repair the items were false at the time they were made by DeVoll or that the promises were made for the purpose of inducing the buyers to enter into the agreement, we cannot conclude that the failures to repair constitute evidence of fraud or fraudulent inducement. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1988) (mere failure to perform contract is not evidence of fraud; fraud requires evidence that representations were made with intent to deceive and with no intention of performing as represented); *see also Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996) (failure to perform contractual obligation does not constitute a "false, misleading or deceptive act" in violation of the DTPA).

We do, however, agree that DeVoll's statement that there was nothing wrong with the house is an actionable material misrepresentation. We reach this conclusion by examining the

evidence presented at trial in the light most favorable to the jury's findings. *See Prudential*, 896 S.W.2d at 159. Although DeVoll told Dowds there was nothing wrong with the house, there is circumstantial evidence in this record that DeVoll knew the roof and plumbing were defective. *See Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 277 (Tex. 1995) ("Superior knowledge by one party may also provide the occasion for fraud."). Stein, who inspected the home after Demonbreun and Dowds discovered the defects, testified that most, if not all, of the roof leaks were present before Demonbreun purchased the house, because the roof was old and the leaks could not have appeared "overnight." Stein believed that heavy acoustic was sprayed on the ceiling to hide evidence of leaks. Stein further discussed the plumbing leak that Dowds discovered in the kitchen. He testified that some plumbing work had recently been performed because fresh concrete had been poured around a rotted pipe. Stein opined that the unsuccessful repair was made within two years prior to his inspection of the home. Stein also verified that the leak Dowds described in the office had been recently repaired. Stein photographed a new piece of plywood, and stated "[t]his is something that someone went in recently . . . [b]ecause this piece of plywood would show a lot of water damage on it and it doesn't. . . . Someone knew about this leak." Actual knowledge can be established by circumstantial evidence, but only when the evidence, directly or by reasonable inference, supports that conclusion. *See State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002); *see also City of San Antonio v. Rodriguez*, 931 S.W.2d 535, 537 (Tex. 1996). Given Stein's testimony that the plumbing repairs were performed within the two-year period that DeVoll owned the home, the jury could have reasonably inferred that DeVoll or one of his workers knew about the plumbing leaks. Similarly, the jury could have inferred that DeVoll knew the acoustic was sprayed for the purpose of concealing the roof defects. Further, Demonbreun and Dowds

testified that the only defect DeVoll revealed was the preexisting roof leak associated with the HVAC system and that they would not have purchased the house had they known about the extent of the defects. Viewing the evidence in the light most favorable to the jury's verdict, there is evidence to support the jury's conclusion that DeVoll misrepresented the condition of the property with the intention of inducing Demonbreun and Dowds into a transaction they would not have otherwise entered into. Because DeVoll had superior knowledge of the house's condition, including knowledge that certain repairs had been made or attempted, his statement that there was nothing wrong with the house amounted to a fraudulent representation. *See, e.g., GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889-90 (Tex. App.—Austin 2008, no pet.) (determining vehicle seller's statements that he had "no problems [whatsoever]" to be a factual representation where "an inspection revealed structurally unsafe engine frames, corrosion, and serious engine problems").

Finally, we address an argument raised by DeVoll relative to the independent inspection. DeVoll argues that the pre-sale inspection John Blanco conducted on Demonbreun and Dowds' behalf negates the causation required to recover under the DTPA. DeVoll relies on *Lim v. Lomeli* for the proposition that a buyer who hires a professional inspector and obtains and reviews the inspection report cannot establish that he detrimentally relied on a third party's representation. *Lim v. Lomeli*, No. 04-06-00389-CV, 2007 WL 2428078 (Tex. App.—San Antonio Aug. 29, 2007, no pet.) (mem. op.). DeVoll, however, misstates our holding in *Lim*. In that case, the Lims' pre-sale inspection revealed potential water damage throughout the house. *Id*. at *1. The Lims' own real estate agent, Lomeli, reviewed the inspection report, conferred with the inspector, and then urged the buyers to continue with the transaction, which contained an "as is" clause. *Id*. Shortly after closing, the Lims experienced profuse leaking in the house;

they sued the seller, the inspector, and Lomeli. As to Lomeli, the Lims alleged he failed to disclose his full knowledge of the home's defects. *Id.* Lomeli filed traditional and no evidence motions for summary judgment. The trial court found that the only evidence of Lomeli's knowledge about the extent of the water penetration issues was his testimony that he was unaware of any problems beyond those noted in the inspector's report. *Id.* at *4. The trial court thus granted summary judgment in favor of Lomeli. We affirmed the summary judgment, holding that because the information from the inspection report was equally available to the Lims, causation and reliance were negated as a matter of law. *Id.*

The underlying basis for our decision in *Lim* was that because the Lims failed to present more than a scintilla of evidence that Lomeli knew anything "more or different" than they did about the condition of the home, they could not establish that they detrimentally relied on Lomeli's alleged misrepresentations. *Id.* This court has *not* held, as DeVoll asserts, that a buyer's independent inspection will negate causation and reliance in every instance. Additionally, we find *Lim* to be distinguishable because in this case some of the home's defects were not visible or discoverable by inspection. Specifically, the roof leaks were hidden by the heavy acoustic spray and the plumbing problems were concealed behind the wall. Accordingly, information about the existence of these defects was not equally available to Demonbreun and Dowds.

Based on the foregoing, we conclude that *Prudential* is not controlling. Given the terms of the agreement and the evidence presented, we hold that the "as is" clause does not negate causation as a matter of law. DeVoll's first issue is therefore overruled.

## II.     *Unconscionable Action*

DeVoll next argues that there is no evidence, or at least insufficient evidence, that he engaged in an unconscionable action or course of action. *See* TEX. BUS. & COM. CODE ANN. § 17.50(a)(3) (West 2011). The trial court submitted the case to the jury based on two separate DTPA violations. In Question Number 1, the jury was asked whether DeVoll engaged in any false, misleading, or deceptive act or practice that Demonbreun and Dowds relied on to their detriment and that was a producing cause of damages to Demonbreun and Dowds. *See id*. §§ 17.50(a)(1)(A); 17.46(b) (West 2011). In Question Number 2, the jury was asked whether DeVoll engaged in any unconscionable action or course of action that was a producing cause of damages to Demonbreun and Dowds. *Id*. § 17.50(a)(3). The jury answered both questions, "yes." On appeal, DeVoll only challenges the jury's finding under Question Number 2. However, because we may uphold the judgment based on the jury's unchallenged finding in Question Number 1 under section 17.46(b) of the DTPA, we need not address DeVoll's argument concerning unconscionability. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 440 (Tex. 1995) (noting appellate court did not address unconscionability finding when trial court's DTPA judgment was upheld on another theory); *see also Gillman Imps. of San Antonio, Inc. v. Castillo*, No. 04–95–00670–CV, 1996 WL 383112, at *5 (Tex. App.—San Antonio July 10, 1996, no writ) (mem. op.) (not designated for publication) (citing *Parkway* and declining to address jury's unconscionability finding because judgment could be upheld based on other DTPA violations). We thus overrule DeVoll's second issue.

## III.    *Mental Anguish Award*

Finally, DeVoll argues that the evidence is factually insufficient to support (1) the jury's finding that Demonbreun suffered mental anguish and (2) the award of $9,000 in mental anguish

damages. When an appellant challenges the factual sufficiency of the evidence on an issue on which he did not have the burden of proof, the appellant must demonstrate the evidence is insufficient to support the adverse finding. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ). In reviewing this point, the appellate court considers, weighs, and examines all the evidence presented at trial. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We set aside the finding for factual insufficiency only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Demonbreun testified that prior to purchasing the house from DeVoll, she was depressed because of her mother's death, but that the problems with the house made her depression worse. She had to see a psychiatrist and was prescribed medication for depression. She had trouble eating and problems sleeping, and did not feel like doing anything. Demonbreun purchased the house with money her mother left to her, and she felt badly that the home ended up having so many defects because her mother told her to spend the money wisely. Dowds testified that Demonbreun was in a state of depression for "the year" and that she would be in bed all hours of the day. They moved out of the house in March of 2009, and Dowds stated that Demonbreun has gotten better since then.

Damages for mental anguish are appropriate when there is either "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine", or other evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (quoting *Parkway*, 901 S.W.2d at 444); *Lefton v. Griffith*, 136 S.W.3d 271, 279 (Tex. App.—San Antonio 2004, no pet.). Although

Demonbreun did not testify as to how long she was depressed or had trouble eating and sleeping, we conclude Dowds' testimony that Demonbreun was depressed and unable to get out of bed for a year, but improved after she moved out of the house, suffices to support the jury's finding on mental anguish. *See Parkway*, 901 S.W.2d at 444 (noting that evidence of mental anguish can be in form of third party's testimony). Because the evidence supporting the jury's finding is not so weak as to be clearly wrong and manifestly unjust, we decline to sit as a thirteenth juror and overturn the decision of the jury. *See Gainsco Cnty. Mut. Ins. Co. v. Martinez*, 27 S.W.3d 97, 108 (Tex. App.—San Antonio 2000, pet. dism'd by agr.). As to the amount of the award, we cannot conclude that $9,000 is an unfair or unreasonable amount of compensation. *See Bentley v. Bunton*, 94 S.W.3d 561, 566 (Tex. 2002) (the amount of a mental anguish award must be fair and reasonable). DeVoll's third issue is overruled.

## CONCLUSION

Based on the foregoing reasons, we overrule DeVoll's issues on appeal, and affirm the judgment of the trial court.

Phylis J. Speedlin, Justice