In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00222-CV**
_____

**GICOR, INC., MEMO EXPRESS, L.L.C., AND
FLORENCIO GUERRA, Appellants**

**V.**

**WAYNE BREWER AND MELINDA BREWER, Appellees**

_____

**On Appeal from the 457th District Court
Montgomery County, Texas
Trial Cause No. 17-10-12045-CV**
_____

**MEMORANDUM OPINION**

This lawsuit relates to a dispute over a townhome purchased by the Appellees, Wayne and Melinda Brewer ("Appellees," "Plaintiffs," or "the Brewers"), located in "Bellago," a community on Lake Conroe. The Bellago Townhomes were developed by Appellant Memo Express, L.L.C. ("Memo") and designed and constructed by Appellant Gicor, Inc. ("Gicor"), and Appellant Florencio Guerra ("Guerra"), the President of Gicor and the sole member and Manager of Memo

1

(collectively "Defendants" or "Appellants"). The Brewers purchased their townhome in September 2016. The townhome was approximately one year old at the time of purchase and the Brewers did not purchase the townhome directly from the Defendants.

The Brewers filed suit against the Defendants alleging damages relating to erosion, drainage, foundation, and related design and construction problems. After a jury trial, the jury rendered a verdict in favor of the Brewers finding (1) violations of the Texas Deceptive Trade Practices Act ("DTPA"), (2) knowing and intentional violations of the DTPA, (3) negligence, (4) negligent misrepresentation, (5) gross negligence, and (6) fraud. The jury also found that Defendants Memo and Guerra were responsible for the conduct of Defendant Gicor, and that Defendant Guerra was responsible for the conduct of Defendant Memo. The jury found that the Plaintiffs were entitled to $67,500 for actual damages;[1] and the jury awarded exemplary

---

[1] In the charge, Question 13 and its instructions asked the Jury the following:

If you answered "Yes" to Question 1, 2, 3, 6, 7, or 9, then answer the following question. Otherwise, do not answer the following question.

**Question No. 13**
What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Wayne and Melinda Brewer for their damages, if any, that resulted from such conduct?

Consider the following element of damages, if any, and none other.
1. the reduction in current market value of the Property.

damages in the amount of $90,000 as to defendant Gicor, $90,000 as to defendant Memo, and $90,000 as to defendant Guerra. The Brewers filed a motion for entry of a judgment and sought a recovery under theories of negligence, negligent misrepresentation, fraud, and gross negligence.[2] The trial court rendered a Final

---

"Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any, for any of the following questions you answered "Yes."

1. the reduction in current market value of the Property:
    For Question 1:    Answer: $67,500
    For Question 2:    Answer: $67,500
    For Question 3:    Answer: $67,500
    For Question 6:    Answer: $67,500
    For Question 7:    Answer: $67,500
    For Question 9:    Answer: $67,500

[2] The Brewers did not seek a judgment for a recovery of attorney's fees even though the Jury awarded them $156,915 for attorney's fees. Presumably the Brewers knew the claims on which they elected to seek a judgment would not allow for a recovery of attorney's fees. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 667 (Tex. 2009) (attorney's fees are not allowed for torts like fraud); *Brosseau v. Ranzau*, 81 S.W.3d 381, 398 (Tex. App.—Beaumont 2002, pet. denied) ("Generally, attorney's fees are not recoverable in tort actions unless provided by statute.").

Judgment awarding actual damages in the amount of $67,500, prejudgment interest at 5%, together with exemplary damages in the amount of $90,000 from Gicor, $90,000 from Memo, and $90,000 from Guerra. Appellants raise six issues on appeal. We affirm.

Issues On Appeal

Appellants raise six issues on appeal, which they state as follows:

Issue One. Because Todd Rotholz's appraisal impairment testimony is unreliable, the evidence was legally insufficient and there was no evidence to support the jury's verdict of damages as to diminution in value. Therefore, the trial court erred in awarding actual damages based upon that testimony.

Issue Two. The trial court erred, in submitting to the Jury, Question 13 with respect to actual damages, because it was not the proper measure of damages under Texas law, which is the difference in value, when Appellees purchased the Townhome between the property as represented, and the actual market value of the Townhome at that time. Similarly, the trial court should not have overruled the submission of the properly worded question, when Gicor, Memo, and Guerra submitted it with respect to the actual damages issue. Similarly, the trial court erred when it entered judgment on an improper measure of actual damages.

Issue Three. Because Question 13 with respect to actual damages was the improper measure of damages, the trial court erred in entering judgment on that measure of damages, the Jury's finding of which was immaterial.

Issue Four. The trial court erred in permitting Appellees to amend their pleadings post-trial and after entry of the final judgment, because the amendment operated as a surprise which was severely prejudicial to Gicor, Memo, and Guerra.

Issue Five. The trial court erred in submitting exemplary damages questions to the Jury, and in rendering final judgement thereon, because there can be no exemplary damages, if there are no actual damages.

Issue Six. The trial court erred in awarding prejudgment interest in the final judgment, because Appellees had not pled their claim for damages until after the trial court had rendered a final judgment.

Procedural and Factual Background

The Brewers filed an Original Petition against Defendants in October 2017 complaining of issues associated with a townhome the Brewers purchased in September 2016 ("unit 55"). They then filed a Second Amended Petition in July 2020. In September 2020, the Brewers filed a Third Amended Petition ("the Petition"), which was the live petition at the time of trial.

According to the Petition, Guerra submitted a plat for the Bellago townhome community and obtained a permit for construction. As a requirement for its permit, Gicor submitted a drainage plan for controlling water flow toward Highway 105 West, which Montgomery County approved. In 2010 and 2011, Montgomery County received complaints from the April Villas Homeowners' Association, which owned the property adjacent to Bellago, about surface water runoff allegedly caused by "the sharp angled drop-off of the grading for fill soil used by Gicor." The County notified Gicor in May 2011 about the complaints and noted that certain elements of the approved drainage had not been constructed. According to the Petition, Defendants made some improvements to the drainage plan in February 2012.

5

The Petition alleged that construction of the Bellago community included bringing in sixty-six loads of fill dirt, which resulted in a steep grade behind the townhomes, and the Defendants allegedly did nothing to reinforce the sloped embankment. According to the Petition, Gicor built unit 55 in early 2015, which Gicor sold to Joseph and Sherry Marinari. By June 2016, the homeowner's association for neighboring April Villas complained about drainage issues. The Petition alleged that Defendants tried to fill foundation gaps with sand, the sand washed away when it rained, they dug a swale and installed underground drainage, but these efforts did not resolve the problems.

The Brewers alleged in the Petition that over twelve years, Defendants repeatedly and intentionally failed to comply with industry standards, best practices, municipal codes, and ordinary care. And in the Petition, they alleged that they were unaware of this history when they started considering buying a new townhome at Bellago in 2016. The Brewers alleged that when they met with Defendants about the more recently built townhomes, the Defendants made representations about the quality and reliability of homes constructed at Bellago, and based on this meeting and the representations, the Brewers later purchased unit 55 from the Marinari family, who had owned the unit for less than a year. According to the Petition, within months after the Brewers bought unit 55 from the Marinaris, the Brewers noticed visible signs of construction defects:

6

There was erosion and damage to soil fill, especially after rainfall, due to an improper drainage system. This erosion included development of gaps in the soil along the grassy slope edge in the backyard (which created the risk of tripping and/or falling in the backyard) as the soil began to pull away from the foundation, the deterioration and migration of the grassy slope every time it rained, and the resulting reduction of the overall size of the Brewers' already small backyard. Rainwater runoff further eroded the soil, which led the Bellago Homeowners Association (controlled by Defendants) to install a subterranean drain line or French drain system. The slope of the soil was too steep. The soil was relaxing and deforming, and continues to relax and affect the bearing of the foundation.

In May 2017, the Brewers approached the City and County to attempt to resolve the construction and drainage issues, but they alleged after they were unable to achieve a resolution on their own, their attorney sent the Defendants a DTPA demand letter on July 7, 2017.

The Brewers alleged that Gicor and Memo should be vicariously liable for Guerra's acts and omissions. They also requested to pierce the corporate veil and impose direct liability on Guerra for acts and omissions of Gicor and Memo. The Brewers asserted claims against the Defendants for violations of the Texas Deceptive Trade Practices Act ("DTPA"), negligence, negligent misrepresentation, gross negligence, fraud, fraud by non-disclosure, private nuisance, breach of the implied warranty of habitability, and breach of the implied warranty of good and workmanlike services. The Brewers sought to recover actual, economic, consequential, compensatory, exemplary, treble, and mental anguish damages; the reasonable cost of repairs needed to cure defects in construction and to replace any

7

damaged goods in the home; engineering and consulting fees; temporary housing during repairs; and damages for a "[r]eduction in current market value, if any, after the construction defect is repaired if the construction defect is a structural failure;" pre- and post-judgment interest; and attorney fees and costs.

The Defendants filed a general denial and claimed that comparative fault barred the Plaintiffs' claims. The Defendants also alleged that Memo and Guerra were not liable in the capacity in which they were sued. After a jury trial in May 2021, the jury rendered a verdict in favor of the Brewers, finding violations of the DTPA, knowing and intentional violations of the DTPA, negligence, negligent misrepresentation, gross negligence, and fraud. The jury also found that Defendants Memo and Guerra were responsible for the conduct of Defendant Gicor, and that Defendant Guerra was responsible for the conduct of Defendant Memo. The jury found that the Plaintiffs were entitled to $67,500 for actual damages, and it awarded exemplary damages in the amount of $90,000 as to Defendant Gicor, $90,000 as to Defendant Memo, and $90,000 as to Defendant Guerra.

Following the jury's verdict, the Defendants filed a motion for judgment notwithstanding the verdict, alleging the verdict was not supported by the pleadings. In their response, Plaintiffs argued that their pleadings supported the jury's verdict, and alternatively they requested leave to file an amended petition that conforms to

8

the evidence. The trial court granted the Plaintiffs leave to file a Fourth Amended Petition and signed the Final Judgment. Defendants timely filed a notice of appeal.

Evidence at Trial

Testimony of Melinda Brewer

Melinda testified that she and her husband looked at the Bellago townhome community in the fall of 2016 because they were interested in buying a townhome. The Brewers met with Mr. Guerra and Mr. Villalba at the Memo-Gicor office, and their discussion included the development and construction process, the plans, and the quality of the work. According to Melinda, Guerra and Villalba told the Brewers that Bellago was "designed by licensed architects and engineers[,]" and that Villalba was a licensed architect and was onsite during the construction to make sure that codes and standards were followed. Melinda testified that they were shown "a material list[,]" and she identified Plaintiffs' Exhibit 100 as what the Brewers were shown. Exhibit 100 is titled, "Bellago Townhomes[,] Material Specifications Sheet[,]" and at the bottom of the page is the following statement: "Over 25 years of experience in quality craftsmanship or several hundred new construction and renovations of commercial and residential projects in Montgomery County Texas. Building plans, specifications, and construction are completed by licensed professionals in accordance with the International Building Codes." Melinda also testified that Guerra told them, "[f]rom dirt to the roof, you have licensed

9

professionals on-site overseeing this work[.]" According to Melinda, Guerra did not indicate that his statements only applied to the new townhomes being built at the time.

Melinda testified that she and her husband Wayne were impressed to meet with the owner, builder, and developer, and they felt reassured that if they bought a home in Bellago, they would get a quality townhome. Melinda testified that they told their realtor they wanted to "go with" new construction at Bellago because they were impressed with the builder, but their realtor told them an existing unit—unit 55—was currently for sale and had upgrades the Brewers were interested in as well as a boat lift and boat cover. Within a few days of meeting with Guerra, the Brewers made an offer on unit 55. According to Melinda, the seller's disclosure for unit 55 did not indicate any problems, and the inspection only identified a few minor repairs to be made.

Melinda testified that she and her husband noticed that the townhomes were built at "a significant amount of elevation[]" from the ground. After they moved in, the Brewers noticed issues with the backyard, including a slope between the back patio and a white fence, and some loss of land due to erosion. Melinda also testified they noticed that "the land [was] actually pulling away from the foundation." According to Melinda, she became concerned about the voids between the grass and slab, the loss of backyard area, and the slope movement. Melinda told Guerra about

10

these issues, she hired a civil engineer to inspect the property, and she contacted the City of Conroe. The Brewers also poured play sand into the gaps between the foundation and the ground about every six months, to try to fill the voids.

Melinda did not hear back from Guerra about her concerns, and later she approached him at a Property Owners Association ("POA") meeting and told him they needed a retaining wall. According to Melinda, Guerra replied that a retaining wall was not needed because the property "had been designed by a licensed engineer and architect[.]" Melinda repeated the need for a retaining wall at another POA meeting, and Guerra responded that "no one was going to dictate to him, that he worked on his own time." Melinda testified that downspouts and an underground drain system were installed, and Guerra said this would solve the problem, but this did not take care of the surface water that would flow off the roof and go into her backyard, and water still collected in a low point next to the foundation of the Brewers' home. According to Melinda, after having tried to work with Guerra and after contacting the City and County, the Brewers hired an attorney.

Melinda testified that cracks had developed in the stone on the home's exterior, cracks developed in the interior walls and corners, and cabinets and the fireplace started to separate from the wall. She also testified there was a separation between the patio and an exterior wall, there had been significantly more soil

11

erosion, and the ground was at varying levels. Several photo exhibits were admitted into evidence showing areas inside and outside of the Brewers' townhome.

Melinda testified that based on the current conditions of their home, Melinda did not believe that anything Guerra told them in their 2016 meeting was true. She also testified that if the Brewers had not met with Guerra and listened to what he had told them in 2016, they would not have purchased unit 55.

Testimony of Wayne Brewer

Melinda's husband Wayne testified that Guerra told the Brewers in the meeting in 2016 that the contractors he used were professional and licensed, and that Guerra would be supervising the contractors. Wayne testified that when Guerra met with the Brewers, Guerra did not differentiate between the then-existing units (such as unit 55) and the ones that were being built. According to Wayne, the Brewers would not have purchased unit 55 if they had not met with Guerra because Guerra gave them a "comfort level" and because it meant a lot to them to talk with the developer himself.

Wayne estimated that there had been a loss of one to two feet of the sloped backyard after they bought the unit, and at the time of trial, the area was "half now compared to what it was." Wayne testified that he had observed gaps of an inch-and-a-half to two inches between the end of the slab and the soil along the foundation. Wayne testified that he put play sand in the void at the suggestion of Chris Bogert,

12

who worked for the City and Wayne had observed a neighbor doing the same thing. According to Wayne, he had used a tape measure and determined the gap went down about sixteen inches into the fill soil.

Testimony of Florencio Guerra

Guerra testified that he is the president, manager, and sole member of Memo, that Memo developed Bellago, and Gicor built the townhomes. Guerra also explained that Mr. Villalba is the director of construction for Gicor, and Villalba was construction superintendent at Bellago.

Guerra testified that he did not have records for unit 55 or other units that have sold "because it would be just too much paperwork[,]" and he could not find the records of soil sampling or geotechnical testing of the soil for the construction of unit 55. According to Guerra, Rusty Tejcek was the contractor who did the soil testing and provided fill dirt for unit 55. Guerra testified that because the County did not require compliance with the International Building Code ("IBC"), Gicor decided not to reference the IBC in connection with the construction of the townhomes. Guerra recalled that he left it up to the contractors that Gicor hired to decide how to pour the foundation on fill soil and how to build the adjacent slope. According to Guerra, nothing was wrong with the construction of the Bellago townhomes because everything was built according to the plans and requirements. Guerra testified that Wanda Fick, who is an architect, drew the plans for Bellago.

13

According to Guerra, at one point, the owner of unit 41 had complained about water getting into the foundation, and Guerra hired a company to make an underground drain. At another time, piers were placed under the foundation of units 54 and 55 to support the weight of the fire wall. After Guerra received complaints about drainage from Melinda in April or May 2017, he contacted Stabilicore, who recommended installing downspouts and an underground drain, and as far as Guerra knew, the drainage issue was resolved. Guerra agreed that he had received complaints from the City of Conroe about water drainage at Bellago but according to Guerra "everything was corrected." Guerra believes the state of the backyard common area of the townhomes is a maintenance issue, not a construction issue, and it is the POA's responsibility. Guerra did not recall whether he had heard complaints about the slope of the fill soil deteriorating and moving, nor did he recall hearing any such complaint from Villalba.

Guerra testified that American Civil Engineers ("ACES") designed the drainage plan, and he did not know whether the plan called for using fill soil, but using fill soil was a common practice. Guerra believed that the slope behind unit 55 had stabilized. Guerra also testified that April Villas, the neighboring development, built the fence along the property line, and Guerra had not seen that fence move.

Testimony of Dan Wilds

Dan Wilds testified that he is the First Assistant County Engineer for Montgomery County where he reviews drainage plans to make sure they meet the County's criteria. He reviewed the drainage plan for Bellago, which was originally submitted in 2005. According to Wilds, an initial concern with the Bellago drainage plan was that it did not account for a detention pond to mitigate runoff to the highway. After he reviewed the plans, he was not involved with drainage at Bellago until there was a complaint. Wilds then went to look at the property and saw that the site was not in compliance with the approved drainage plan because there was supposed to be a swale or ditch along the eastern boundary of Bellago to bring the water into a storm sewer pipe and into the lake, but the swale had not been constructed. Wilds testified that he wrote a letter to Guerra in May 2011, which was admitted into evidence as Plaintiffs' Exhibit 2D, and another letter in November 2011, which was admitted as Exhibit 2E, that stated that the drainage work had not been done. According to Wilds, the matter was referred to the County Attorney's office, and he believed the work was completed in early 2012. Wilds testified that based on his visit to Bellago in April 2012, it appeared that the drainage at Bellago was in substantial compliance with the approved drainage plan.

15

Testimony of Luis Villalba

Luis Villalba testified that he is the director of construction for Gicor, that he oversaw the construction at Bellago, and that Guerra is his boss. Villalba testified that he is an architect licensed in Colombia but not in Texas, and that Fick, who prepared the architectural plan, was a designer and he did not know if she was an architect. Villalba testified that Exhibit 100, the Materials Specification Sheet, should not be read to suggest that architects were used in the design of the structure.

According to Villalba, construction of buildings 4 and 5 at Bellago, which includes unit 55, required the use of fill soil to be brought into the property to level the ground. Villalba agreed that he was responsible for making sure the soil was prepared before pouring the foundation, and that outside contractors did the actual work. According to Villalba, Rusty Tejcek was the contractor who brought in the fill soil, and Keelan Engineer designed the foundation. Villalba testified that Keelan conducted an evaluation of the native soil before bringing in fill soil, and Keelan's report stated that the soil was "brown, sandy clay with scattered limey rocks[]" and "soil is hard and brittle when dry, but somewhat plastic when moistened." Villalba testified that building 5, which includes unit 55, was built on fill soil and not on native soil. Villalba also testified that it was not clear to him what the IBC required for slope stability.

According to Villalba, although Keelan's plan, admitted as Exhibit 7, reflects that Keelan required fill soil of eight inches, more than eight inches of fill soil was placed in the area where building 55 was constructed, and the bottom of the porch beam for unit 55 does not rest in native soil, but rather in fill soil material, which he agreed does not comply with the specifications in Exhibit 7. Villalba calculated that the fill soil under unit 55 on the porch beam side was between two and three feet. According to Villalba, Stabilicore did not create a swale for drainage behind unit 55, but they placed a pipe connection to reduce the hydraulic weight on the back part of the unit. Villalba also testified that Stabilicore modified ACES's drainage plan when they installed downspouts and an underground drain, and that ACES was not consulted about this modification.

Villalba testified that the POA was responsible for maintaining the area from the back patio of building 5 to the white picket fence eastward, and that neither Gicor nor Memo was responsible for the maintenance. Villalba also testified that in the construction, he deviated from the drawings of the beams (per Exhibit 7) due to "lot conditions[.]" According to Villalba, a photograph of the property admitted into evidence depicted a slope of thirty-three to forty-five degrees, but he stated he does not think the slope looks unstable. Villalba testified that, when he looked at the Brewers' home about a year before trial, he did not think the foundation looked like it was failing nor did he see any cracks in the foundation, and he thought the cracks

17

inside the Brewers' home could be caused by normal settling. Villalba testified that the slope leading to the fence separating Bellago and April Villas was designed to be thirty-three degrees, and he agreed it has eroded to a forty-five-degree slope. Villalba agreed there had been issues with erosion of the slope for years. He also testified that if Gicor wanted to build a retaining wall, it would require the permission of the POA.

Testimony of Christopher Bogert

Christopher Bogert testified that he is the City engineer for the City of Conroe, and his work includes reviewing site development work "from the ground down[.]" Bogert recalled that the Bellago property was involuntarily annexed by the City, and that two or three of the seven units were already constructed at the time of annexation.

Bogert testified that he had been asked to look at a building on the east side of the Bellago property. The City had received a complaint, and Bogert investigated it to see whether the drainage plan had been complied with. Bogert identified Exhibit 3 as the drainage plan for Bellago. Bogert recalled meeting with Guerra and another City inspector in August 2016, and the purpose of the meeting was to tell Guerra that construction needed to comply with the drainage plans. Bogert told Guerra that the construction did not comply, and Guerra indicated he would make sure it was built according to the plans. Bogert recalled another contact with Guerra about a year

18

later about a complaint from a neighbor. Bogert met with Guerra again in May 2017, and Guerra said he would make corrections to address another drainage issue.

Testimony of James Drebelbis

James Drebelbis testified that he is a licensed professional engineer in Texas, and he does forensic engineering to diagnose problems of construction and sometimes causation of problems. His supplemental report was admitted as Exhibit 48. According to Drebelbis, when he visited the Bellago site in October 2018, he knew there was concern about the foundation having moved, and he understood there was a slope to the land before the townhomes were built. Upon visiting the site, he saw that the slope was almost forty-five degrees, and he observed about a sixteen-inch drop from the Brewers' back porch to the ground, and another three-to-five feet drop to the grade below. Drebelbis described the slope as "slightly failed[,]" and testified that there was some shallow rotational failure in the slope. Drebelbis testified that there was bulging in the soil that pushed the fence out and away from the soil, which indicated to him that there was mass movement of the soil, and he explained that such mass movement is a slow migration of clay soil material that occurs because clay is "plastic[.]" According to Drebelbis, when a slope has both rotational and mass movement failure, it means the slope is not stable, which may occur when a slope is too steep. Drebelbis observed instances where the soil had pulled away from the foundation of the Brewers' townhome, which he testified may

19

occur when there is mass movement of soil or when the soil shrinks. Drebelbis testified that the steepness of the slope and rotational and mass movement failures of the soil would typically manifest in the structure of the house, but it could take years to occur. Drebelbis testified that "the most likely effect is that the resisting soil that's holding [] up the foundation is going to go away[,]" and ultimately there will be settlement on the east side of the townhome and "[i]t's going to start dropping on that side." He further testified to a reasonable degree of engineering certainty that as the soil underneath the townhome continues to migrate to the east without anything to support it, there will be progressive movement of soil underneath the foundation. According to Drebelbis, the most common way to address such issues is to put in a retaining wall, and without a retaining wall, the soil will continue to slough and move to the east away from the foundation and will affect the foundation. Drebelbis testified that, when he met with the Brewers in October 2018, they told him that the POA had denied requests to install a retaining wall.

Testimony of Scott McCaslin

Scott McCaslin testified that he is an architect and construction manager, he owns McCaslin Associates, Incorporated, and he is a licensed architect in Texas. He testified that he was retained to provide a cost analysis based on Drebelbis's report. According to McCaslin, when he visited the Bellago site, he thought the problem was that the site was sloping off, which he stated was "fairly common" when fill soil

is added around a building during construction. McCaslin proposed building a retaining wall along the entirety of building 5 and beyond that would be a "terraced wall with a rack-back system" with three levels of terrace, using precast materials and soil anchors, which reduces the need for big equipment in the area, and including an underground drain system with a sump pump. McCaslin testified that the total project cost for the retaining wall would be $193,386, and he developed a second estimate based on not moving the fence on the April Villas property and using one retaining wall that was not terraced, and the cost estimate for this second plan was $111,255.

McCaslin also testified that he reviewed Guerra's and Villalba's depositions, and in McCaslin's opinion, for a construction superintendent to admit he did not know of nor follow the building code was "not very responsible construction." McCaslin's report was admitted into evidence as Plaintiffs' Exhibit 58, in which he wrote, in part, "Many of these problems appear to have been the result of improper or incomplete construction, that resulted from poor construction practices by Gicor. Since Gicor did not have proper inspections[] during construction, which is required and is standard practice."

Testimony of Todd Rotholz

Todd Rotholz testified that he is a commercial real estate appraiser in the Houston area, and he has been registered in Texas to appraise real estate for more

than twenty years. Rotholz testified that he used the comparable sales approach in this case, which looks at comparable sales and he makes adjustments for specific characteristics of the property. According to Rotholz, he visited unit 55 in October 2018, when he did the original appraisal, and again in October 2020.

Rotholz described the property as generally "a very nice townhome[]" in "very good condition." In Rotholz's opinion, fill dirt had been put in to raise the townhome slabs to a certain level, and the main concern was at the rear of the property where there was a "relatively severe drop" and "significant slope to the property line." He testified that there was "some undulation in the soil[,]" and the property-line fence was "bowed out a little bit[]" with some "evidence of soil movement."

Rotholz testified that he looked at market data available through the MLS, as well as information from the Montgomery County Appraisal District. In his 2020 report, he included information from three sales in Bellago. His 2020 evaluation indicated a "Hypothetical Market Value Unencumbered[]" of $225,000 for unit 55, which he explained would be the likely "list price" for the property, not adjusted for any potential issues with the property. He testified that he used the Drebelbis report to arrive at an encumbered value for the property, specifically regarding the steep incline at the edge of the rear of the property, and the engineer's opinion that a retaining wall was necessary to stop soil movement. Then he

. . . simply evaluated [] the exposure or fear factor that a buyer would be faced with, to determine at what point would a buyer be willing to accept this risk, at what price point would he be able to accept this risk and still move forward with the purchase, knowing the issue at hand.

In Rotholz's opinion and based on his experience and training in the industry, the Drebelbis report, and McCaslin's estimated cost to repair, a thirty-percent discount—or $67,500—would be enough of a discount to entice someone to risk purchasing the unit. Rotholz testified that his opinion was subjective but based on thousands of hours of appraisals, work experience, discussions with realtors, and knowledge of how buyers and sellers act in the marketplace.

On cross-examination Rotholz was questioned about the source and basis of his 30 percent reduction and estimate and the following exchange occurred:

Q. This number, you don't -- you didn't get from any comparably impaired properties. Correct?

A. Correct.

Q. But this number, then, you apply to the other 38 pages of your report, which gave you the fair market value appraisal. Correct?

A. Yes, sir.

Q. And so all you did was you took the sentence that I just read to you, which is your entire analysis of getting the 30 percent as a specific quantity, and you applied it to your appraisal, which is 38 pages long. Correct?

A. Well, no. It's -- I mean, our analysis covers more than a sentence. We have --

Q. Well --

23

A. -- two pages right here that discusses it. So it's just -- it's not fair to say we -- this was handled in a sentence. It's not fair.

Q. Well, but okay. So let's look, then, at page 38 of your report. Is there anything on page 38 of your report that would give you a 30 percent number specifically?

A. No. We don't have -- we -- I've testified that we don't have comparable data that would -- that would be able to be extracted from a market sale to come up with the 30 percent. It's based on circumstantial information, right, which is the environment of this property, and the risks, absolutely, are considered in here and the costs are absolutely considered in here, and most importantly, the inability for the property owners to act individually to resolve this issue. Those are all considered in the 30 percent that we discuss on both of these pages.

Q. Okay. Well, if -- and so you would say, then, even on page 39, other than the very last paragraph that starts with the words "In summary," there's nothing that gives you a quantifiable number of .3, 30 percent, or 30 of a hundred.

A. No, sir. That is strictly my opinion.

Q. And it's an opinion that you pulled from the *frische luft*.[3] Isn't that right?

A. No. That is not correct, no.

On redirect, Rotholz explained he did not pull his 30% diminution number out of thin air. He testified that his "opinion is based on thousands and thousands of hours and thousands of appraisals and work experience of just evaluating properties,

---

[3] *Frische Luft* is a German phrase that translates to "fresh air," in English. Interglot Translation Dictionary, https://www.interglot.com/dictionary (last visited on July 18, 2023).

how they interact in the marketplace, and most importantly, how buyers and sellers in the marketplace interact to problems that they incur or see during the process."

Testimony of Jeremiah Jackson

Jeremiah Jackson testified that he had previously owned unit 42 in building 4 of Bellago. He agreed that there was a slope from unit 42 down to the original soil, and he had observed issues with the foundation, including cracks in the sheetrock, cracks in the trim, cracks in the caulk points, and doors and windows sticking. Jackson testified that one of the reasons he decided to move out of the Bellago community was because of "a lack of want-to with the [POA] and the developer to repair things." According to Jackson, when he brought up the foundation issue to Guerra, "it was sort of swept under the rug[]" although Guerra told him "it would be looked into and possibly fixed[.]" Jackson recalled that, at the time, Guerra had majority voting rights in the POA. When Jackson listed his unit for sale in 2017, he ended up pulling the listing because a potential buyer had identified foundation issues during an inspection. After that buyer backed out, Jackson dropped the listing price of $175,000, and the unit ultimately sold for $167,000.

Testimony of Julian Duron

Julian Duron testified that he had a home at unit 41 in the Bellago community, which he bought in 2016. He agreed that the unit is built on a slab that is common with other townhomes and that the soil slopes down to a lower level on the property.

25

Duron agreed he was aware of foundation issues when he purchased unit 41 and that the price was reduced about $15,000 due to foundation issues. According to Duron, after he moved into unit 41, he observed some doors that would not close completely, cracks that had been painted over, and cracks outside the unit. Duron testified that at the back of the home, he could "clearly see that the soil there had eroded[]" and dropped.

Duron testified that he hired someone to inspect the foundation before he bought unit 41, and after he bought it, he hired a company to place "14 to 16 piers" to level the foundation, which cost about $12,000. Duron recalled that he spoke with Guerra about three months after buying the home about the foundation issues to say it was dropping and needed repair, and Guerra told him "he would take care of it." The second time he talked with Guerra, Guerra told him he thought that it could get fixed with about four piers and his men could do the work. According to Duron, after meeting with Guerra again, he "more or less figured out [Guerra] [] wasn't going to do" the work, and Guerra told him that because of business and financial issues, he would not be able to do the work. [4]

---

[4] Plaintiffs' attorney Jason Wagner testified about the legal fees that Plaintiffs had incurred. His expert report, admitted as Plaintiffs' Exhibit 95, reflects a total of $116,297.04 in attorney and paralegal fees plus costs in connection with their claims under the DTPA.

After the Plaintiffs rested their case, the defense then moved for a directed verdict. The trial court granted a directed verdict on the Plaintiffs' claim for private nuisance but denied the motion on all other claims. The Plaintiffs withdrew their claim on breach of habitability. The trial court also instructed the parties that he was going to limit the damages to the diminution in value of the townhome.

Defendants' Witnesses and Presentation of Evidence at Trial

Testimony of Florencio Guerra

Florencio Guerra testified again as a witness for the defense. He explained that Gicor buys lots and builds homes in the Lake Conroe area. He testified that GAM Enterprises is a holding company that owns Gicor, Memo Express, and several convenience stores, and that GAM is owned by the Guerra Family Trust. According to Guerra, Memo bought Bellago from some investors and then transferred ownership to Gicor, who was the builder. Guerra testified that "Gicor, through Louis Villalba[]" hired the soil engineers for Bellago and the trade workers. Guerra also testified that the architect for Bellago was not required to be licensed.

Guerra recalled that he met with the Brewers in 2016 before they purchased a townhome in Bellago. According to Guerra, he talked with the Brewers about unit 53, which was a new unit that was for sale at the time. Guerra testified that neither Gicor, Memo, nor Guerra had anything to do with the real estate transaction in which the Brewers bought unit 55. Guerra further testified that he would not have told the

27

Brewers that the City and County became involved due to drainage issues because "those things were related with the drainage with the water that went into [] April Villas, not related with problems with the Bellago project." Guerra agreed that he did not tell the Brewers that the foundation for unit 55 had not been built in accordance with the plans that Keelan had designed, and he did not recall any mention of drainage when he met with the Brewers.

Guerra testified that there are five people on the Bellago POA board, and he occupies one seat. He also testified that there were forty-eight votes in the POA because there are forty-eight lots, and Gicor owned thirteen of the forty-eight lots at the time of trial. Guerra testified that he was not involved in any discussion about how the Bellago POA opposed building a retaining wall, and that the first time he learned of it was when he read the Drebelbis report in this lawsuit. Guerra agreed that when he installed the gutters and connected drainage in 2017, it was necessary to get the POA's agreement.

Guerra agreed that the permit for construction of unit 55 was issued to Memo, and he could not remember when ownership of the lot transferred from Memo to Gicor. He agreed that he personally received the permit to build unit 55. Guerra agreed that he trusted Villalba to get reports on the soil, but he did not have those reports, and there was no way for him to tell what the nature of the soil was under the foundation.

<u>Testimony of George Gordon</u>

George Gordon, an attorney licensed in Texas since 1976, testified that he was asked to give an opinion on Plaintiffs' attorney's fees based on an assumption of $67,500 in damages. After reviewing the billing records and the Third Amended Petition, Gordon's opinion was that the Plaintiffs' attorney's fees are not the usual, reasonable, and customary fees that would be charged in a like or similar case. In Gordon's opinion, Plaintiffs' counsel's billings were more than three times the amount of damages. He also testified that he had not seen any segregation of attorney's fees by cause of action in this case.

After the close of the Defendants' case, the Defendants again moved for a directed verdict, which the court denied.

Analysis

Appraisal Testimony and
Sufficiency of the Evidence on Damages

In their first issue, Appellants challenge the reliability of Appellees' expert's opinion testimony and argue that Todd Rotholz's "appraisal impairment testimony" is unreliable under *Robinson*. *See generally E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex. 1995) (setting forth "non-exclusive factors" for courts to use to determine whether scientific evidence is relevant and reliable and may be admitted under Rule of Evidence 702). According to Appellants, Rotholz offered his opinion that there is a thirty percent diminution in value for the Brewers'

home "[w]ithout explaining any basis whatsoever[.]" Appellants argue that Rotholz failed to apply the Uniform Standards of Professional Appraisal Practice ("USPAP") analysis of risk, use, cost, and comparably impaired properties to render his opinion on the thirty percent impairment in the townhome's market value. Appellants assert that Rotholz's opinion was pulled "out of the air" and is unreliable under *Robinson*. According to Appellants, because Rotholz's opinion testimony about the reduction in current market value was the sole measure of actual damages that the jury considered, the evidence is not legally sufficient to support the jury's damages award.

When, as here, a party attacks the legal sufficiency of the evidence to support an adverse finding on an issue for which it did not have the burden of proof, the party must show on appeal that no evidence supports the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Royce Homes, L.P. v. Humphrey*, 244 S.W.3d 570, 574 (Tex. App.—Beaumont 2008, pet. denied). Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In evaluating whether the evidence is legally sufficient, "we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006); *Humphrey*, 244 S.W.3d at 574-75. We sustain legal

sufficiency challenges when there is no more than a scintilla of evidence on the issue. *See Suberu*, 216 S.W.3d at 793. "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983); *see also Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). The jurors are the sole judges of the credibility and weight of the witnesses' testimony, and on review, we do not substitute our own opinion for the jury's verdict. *City of Keller*, 168 S.W.3d at 819. Rather, we assume the jurors made credibility determinations in favor of the verdict if reasonable persons could do so. *Id.*

In *Robinson*, the Texas Supreme Court set forth six non-exclusive factors for courts to consider when determining whether an expert's scientific opinions are reliable and admissible.[5] *See* 923 S.W.2d at 557. However, the Texas Supreme Court

---

[5] In *Robinson*, the court stated,

There are many factors that a trial court may consider in making the threshold determination of admissibility under Rule 702. These factors include, but are not limited to:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert [];

(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

later noted that these factors "cannot always be used with other kinds of expert testimony." *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). In *Gammill*, the Court stated that "the criteria for assessing relevance and reliability must vary, depending on the nature of the evidence[,]" and "[e]xperience alone may provide a sufficient basis for an expert's testimony in some cases[.]" *Id.* at 726, 727. An expert's mere *ipse dixit* will not suffice, and the expert must show how his observations support his conclusions, else the opinion is not reliable due to "'too great an analytical gap between the data and the opinion proffered.'" *Id.* at 727 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

To be admitted into evidence, a real estate appraiser's expert opinion must be relevant and reliable. *Humphrey*, 244 S.W.3d at 579 (citing *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002); *see also* Tex. R. Evid. 702. As a general rule the proper measure of damages in cases involving injury to real property is "the cost to restore or replace, plus loss of use for temporary injury, and loss in fair market value for permanent injury." *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474, 481 (Tex. 2014). The Texas Supreme Court has

---

(6) the non-judicial uses which have been made of the theory or technique.
We emphasize that the factors mentioned above are non-exclusive.
*See E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). Here, the Defendants did not make a challenge to the *admissibility* of Rotholz's testimony.

cautioned that this rule should be applied with flexibility and with consideration of the facts and circumstances of the case. *See id.* When valuing real property, the comparable sales method of determining the market value of real property is a traditional method—and the preferred method—of determining the market value of real property. *See City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). "Under a comparable sales analysis, the appraiser finds data for sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property." *Id.*; *see also Humphrey*, 244 S.W.3d at 579 (citing *Kraft*, 77 S.W.3d at 808). Making adjustments is particularly appropriate for real estate experts to support their appraisal opinions with their experience. *See Williams v. State*, 406 S.W.3d 273, 291 (Tex. App.—San Antonio 2013, pet. denied) (analyzing expert market value opinions in a condemnation proceeding). We have previously recognized that downward adjustments for "stigma" have been allowed in real estate cases. *See Humphrey*, 244 S.W.3d at 576.[6] The Texas Supreme Court has explained, "'[s]tigma damages' essentially constitute 'damage to the reputation of the realty.' They 'represent[] the market's perception

---

[6] Citing *Country Village Homes, Inc. v. Patterson*, 236 S.W.3d 413, 443-44 (Tex. App.—Houston [1st Dist.] 2007, pet. granted, judgm't vacated w.r.m.) (construction defects); *Perry Homes v. Alwattari*, 33 S.W.3d 376, 385-86 (Tex. App.—Fort Worth 2000, pet. denied) (defective foundation); *Smith v. Levine*, 911 S.W.2d 427, 434 (Tex. App.—San Antonio 1995, writ denied) (defective foundation); *Terminix Int'l, Inc. v. Lucci*, 670 S.W.2d 657, 663-64 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.) (termite damage).

33

of the decrease in property value caused by the injury to the property.'" *Houston Unlimited, Inc. v. Mel Acres Ranch*, 443 S.W.3d 820, 824 (Tex. 2014) (citations omitted).

To be sure, damages may not be based on speculative or conjectural evidence. *See Humphrey*, 244 S.W.3d at 580. That said, "[t]he proper way of attacking shaky but admissible evidence is through cross examination." *Williams*, 406 S.W.3d at 291 (citing *Gammill*, 972 S.W.2d at 728).

Todd Rotholz testified that he used the sales comparison approach to develop his opinion, which he explained is based on comparable sales and then the sales are adjusted in comparison with the specific characteristics of the subject property. Rotholz also testified that he looked at market data available from MLS and he reviewed the values applied by the Montgomery County Appraisal District. When developing his appraisal opinion for 2020, he reviewed sales of three townhomes in the Bellago community and determined that the "unencumbered market value" of unit 55 was $225,000. Rotholz testified that he also used the Drebelbis report to arrive at an "encumbered" value for the property, considering the steep incline at the edge of the rear of the property and the engineer's opinion that a retaining wall was necessary to stop soil movement. Rotholz further explained that his adjustment of a 30% reduction in value was based on Rotholz's more-than-twenty years of experience as a real estate appraiser and dealing with buyers and sellers, he

34

. . . evaluated [] the exposure or fear factor that a buyer would be faced with, to determine at what point would a buyer be willing to accept this risk, at what price point would he be able to accept this risk and still move forward with the purchase, knowing the issue at hand.

According to the testimony at trial, Rotholz reached an opinion that a thirty percent discount would be enough of a discount to entice someone to risk purchasing the unit, and during cross-examination, he referred to this discount as "stigma." On cross-examination, he testified that he had considered risk, usability, and cost of repairs in arriving at his opinion. Although Appellants allege that Rotholz "admitted he merely rendered an opinion out of the air," the record reflects that Rotholz testified as follows:

[M]y opinion is not pulled out of thin air. My opinion is based on thousands and thousands of hours and thousands of appraisals and work experience of just evaluating properties, how they interact in the marketplace, and most importantly, how buyers and sellers in the marketplace interact to problems that they incur or see during the process.

The record does not reflect that the defense objected in the trial that Rotholz's testimony was not admissible under Rule 702, and we find no pretrial challenges were made to the admissibility of Rotholz's opinions. Defense counsel cross-examined Rotholz, and Rotholz did agree that "there's nothing that gives you a quantifiable [discount of] 30 percent." The defense offered no witnesses to testify about a comparable sales value nor about damages. On appeal, Appellants concede that "Rotholz arguably did a proper comparable value study of the unimpaired

Townhome[.]" Appellants' sole complaint on appeal pertains to the *30% reduction in value* due to the problems identified at trial.

It was the jurors' responsibility to determine the weight and credibility of Rotholz's testimony. *See City of Keller*, 168 S.W.3d at 819. The record reflects that Rotholz used comparable properties—other townhomes in the Bellago community—to derive a comparable sales approach of an unencumbered value for the home and that his reduction of 30% was explained by him as being based on more than "two decades" of his professional experience as a real estate appraiser and his knowledge of what it would take to entice a willing buyer to purchase the townhome with the existing problems. The defense had an opportunity to cross-examine Rotholz, and the defense offered no competing testimony on the home's value or impaired value.

"The line determining whether an expert opinion is conclusory is difficult to draw, and close calls must go to the trial court." *Windrum v. Kareh*, 581 S.W.3d 761, 770 (Tex. 2019) (internal quotation omitted) (a medical malpractice case). "[W]hen the evidence falls within the zone of reasonable disagreement, the court may not substitute its judgment for that of the fact finder." *Id.*

Based on this record, we cannot agree with Appellants that Rotholz's testimony was unreliable or plucked out of thin air. We conclude there is more than a scintilla of evidence to support the damages, and we overrule Appellants' first

issue. *See Perry Homes v. Alwattari*, 33 S.W.3d 376, 385 (Tex. App.—Fort Worth 2000, pet. denied) (concluding that a realtor's opinion of the "stigma" of a defective foundation was legally sufficient evidence to support a damages award for diminution in value).

Submission of Question 13

Appellants' second issue argues that the trial court erred in submitting Question 13 to the jury because it was not the proper measure of damages. According to Appellants, the proper measure of damages is "the difference in value, when Appellees purchased the Townhome between the property as represented, and the actual market value of the Townhome at that time." Appellants argue that because the instruction on damages was incorrect, the trial court further erred in entering judgment based on an incorrect measure of damages.

We review an allegation of jury charge error under an abuse of discretion standard. *See Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) The omission of an instruction is reversible error only if the error probably resulted in the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002).

Appellants argue that the proper measure of damages for a claim under the DTPA for misrepresentation is either (1) out-of-pocket damages reflecting the difference between the value the buyer paid and the value received or (2) benefit-of-

37

the-bargain damages reflecting the difference between the value as represented and the value received.[7] In this case, however, the jury found the Defendants liable for engaging in a false, misleading, or deceptive act or practice (Jury Question 1); engaging in an unconscionable action or course of action (Jury Question 2); failure to comply with a warranty (Jury Question 3); negligence (Jury Question 6); negligent misrepresentation (Jury Question 7); and fraud (Jury Question 9). Question 13 instructed the jury on damages as to the above-listed claims of liability as follows:

> What sum of money, if any, if paid now in case, would fairly and reasonably compensate Wayne and Melinda Brewer for their damages, if any, that resulted from such conduct?
> Consider the following element of damages, if any, and none other.
> 1. the reduction in current market value of the Property.
> "Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

The Final Judgment states that "[t]he jury unanimously answered '$67,500.00' in answer to Question 13 concerning damages for all liability theories (DTPA, negligence, negligent misrepresentation, and fraud)."

When defense counsel argued his motion for directed verdict, he stated that the date of damage should be the date of the misrepresentation. The trial court responded that the testimony on damages "went by the date that the problem manifested itself." Plaintiffs' counsel argued that when the representations were

---

[7] Citing *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 373 (Tex. 1984).

made, the Brewers had not even bought the unit. The trial court stated that damages should be determined by "diminution of value because it's less than the cost to repair[.] . . . Any current damage must be loss of value."

The Brewers testified that the problems to the foundation, soil, and drainage were not apparent when they purchased the home. Under Texas law, "a recovery of damages for a permanent injury to real property is generally limited to the difference in value before and after the injury." *ExxonMobil Corp. v. Lazy R Ranch, LP*, 511 S.W.3d 538, 540 (Tex. 2017). The Texas Supreme Court has explained that "[a]s a general rule, when an injury to real property is temporary, the owner is entitled to damages commensurate with the cost of restoring his property, but when an injury to the same property is permanent, the owner is entitled to damages commensurate with the loss in the fair market value to the property as a whole." *Gilbert Wheeler, Inc.*, 449 S.W.3d at 476; *see also Houston Unlimited, Inc.*, 443 S.W.3d at 825 ("Generally, we have permitted landowners to recover *either* the lost value of their land if the injury to the land is permanent *or* the cost to repair or remediate the land if the injury is temporary."). In this case, the Defendants do not contend, and the Brewers do not allege, the injury to their property is temporary.

Melinda Brewer testified that their buyer's inspection did not show an issue associated with the structure or the foundation, but that after they moved in, she noticed erosion behind the house and the land "pulling away from the foundation."

39

According to Melinda, even after gutters and an underground drainage system were installed, the erosion and gaps between the foundation and soil did not stop. Melinda testified that, over time, they noticed damage to the inside and outside of the house, including cracks in the wall and ceiling, cracks around the garage, and cracks in the foundation, and cabinets and the fireplace separating from the wall. Wayne Brewer testified that their backyard had lost one-to-two feet since they bought the unit. Appellants complain that the trial court used the wrong measure of damages because it should have instructed the jury to measure the difference between the value Appellees paid and the value they received, as of the date when they purchased the Townhome. In their brief they cite to *Arthur Andersen & Co. v. Perry Equip. Co.*, 945 S.W.2d 812, 815 (Tex. 1997) and *Mid-State Homes, Inc. v. Ricks*, No. 09-97-362-CV, 1999 Tex. App. LEXIS 7705, at **2-3 (Tex. App.—Beaumont Oct. 14, 1999, no pet.).

In *Arthur Andersen*, Perry Equipment Corporation (PECO) sued the accounting firm of Arthur Andersen for a faulty audit of Maloney Pipeline Systems, a company that PECO sought to purchase and did purchase. 945 S.W.2d at 814. At trial, PECO presented uncontradicted evidence that the purchase price it paid for Maloney "was a total loss from which PECO realized no return" and evidence that Arthur Andersen's pre-purchase audit of Maloney contained serious errors. *Id.* The

trial court rendered judgment for PECO, and on appeal, one of the issues was the measure of damages. *Id.*

Arthur Andersen as appellant complained that the jury charge allowed the jury to award PECO the entire purchase price of Maloney without instructing the jury to subtract the value of Maloney stock at the time of the sale. *Id.* at 815. As appellee, PECO argued that it was entitled to direct damages and also the purchase price it paid for Maloney as consequential damages. *Id.* at 816. According to Arthur Andersen, PECO had not introduced any evidence showing that the Maloney stock was valueless at the time of purchase, so that PECO failed to establish that it was entitled to the entire purchase price under *either* benefit-of-the-bargain *or* out-of-pocket damages. *Id.* In discussing damages, the Texas Supreme Court explained that both out-of-pocket and benefit-of-the-bargain damages are recoverable under the DTPA, and each is determined at the time of sale. *Id.* at 817. However, the Court remanded the case for a new trial not only because the charge failed to instruct the jury on the proper measure of direct damages but also because there was some evidence that Arthur Andersen's misrepresentation was a producing cause of PECO's loss. *Id.*

We conclude that *Arthur Andersen* is not relevant to the appeal currently before us. The final judgment in this case did not include a damages award under the DTPA, and the challenges on appeal only concern the proper measure of damages

41

for real property—which the Texas Supreme Court addressed in *Gilbert Wheeler* and *Houston Unlimited*, as we previously discussed. *See* 449 S.W.3d at 476; 443 S.W.3d at 825. Likewise, the judgment in the *Mid-State Homes* was based on DTPA claims and the judgment in this appeal is based on claims arising from fraud; therefore, *Mid-State Homes* is also not relevant here. *See* 1999 Tex. App. LEXIS 7705, at **2-3.

To be fair, we agree the Appellees submitted a DTPA claim to the jury, and the jury awarded them damages on that claim. But since the Appellees also prevailed on their claims of negligence, negligent misrepresentation, fraud, and gross negligence, they moved for judgment on those claims, not on their claim under the DTPA.

The evidence at trial reflects the condition of the home deteriorated and increased in severity over time, and the evidence supports the Brewers' allegations that their damages were permanent, not temporary. Therefore, based on the evidence the trial court did not err in allowing them to recover for the diminished fair market value of their property. *See Gilbert Wheeler, Inc.*, 449 S.W.3d at 476 ("[W]hen an injury to the same property is permanent, the owner is entitled to damages commensurate with the loss in the fair market value to the property as a whole.").

"[T]he trier of fact is afforded considerable discretion in evaluating opinion testimony on the issue of damages." *See McGalliard v. Kuhlmann*, 722 S.W.2d 694,

697 (Tex. 1986). We conclude the trial court did not abuse its discretion by allowing the jury to consider awarding damages according to Question 13 on a record where some evidence was admitted that would allow a reasonable factfinder to conclude the home suffered a reduction in market value after it was purchased as a result of the defendants' conduct. *See id.*; *see also Houston Unlimited, Inc.*, 443 S.W.3d at 825. Additionally, the Appellants have not shown that the trial court's submission of Question 13 probably resulted in an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Williams*, 85 S.W.3d at 166. We overrule Appellants' second and third issues.

Plaintiffs' Fourth Amended Petition

In issue four, Appellants argue that the trial court erred in permitting Appellees to amend their pleadings after trial and after entry of the Final Judgment because the amendment "operated as a surprise which was severely prejudicial" to the Defendants. According to Appellants, filing the Fourth Amended Petition was prejudicial on its face because Appellants "never had a need to designate a rebuttal expert on appraisals as Appellees' designated expert had never rendered an opinion germane to Appellees' pleadings[]" or "to present rebuttal evidence to Rotholz's opinions."

We generally review a trial court's decision to allow or deny a trial amendment before the judgment is signed under an abuse of discretion standard. *See*

*Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990); *Candelier v. Ringstaff*, 786 S.W.2d 41, 43 (Tex. App.—Beaumont 1990, writ denied). However, after judgment is rendered, it is generally too late to amend a pleading. *See Banker v. Banker*, 517 S.W.3d 863, 881-82 (Tex. App.—Corpus Christi–Edinburg 2017, pet. denied). But we will not reverse a judgment on appeal unless the Appellant demonstrates that the trial court erred and that the error probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1).

"An issue is tried by consent when a party introduces evidence to support an issue that is not included in the written pleadings and no objection is made to the lack of pleadings." *See Mid-State Homes, Inc.*, 1999 Tex. App. LEXIS 7705, at *5 (citing *Duncan Land & Exploration, Inc. v. Littlepage*, 984 S.W.2d 318, 327-28 (Tex. App.—Fort Worth 1998, pet. denied)). Texas Rule of Civil Procedure 67 provides,

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. In such case such amendment of the pleadings as *may* be necessary to cause them to conform to the evidence and to raise these issues may be made by leave of court upon motion of any party at any time up to the submission of the case to the Court or jury, but failure so to amend shall not affect the result of the trial of these issues; provided that written pleadings, before the time of submission, shall be necessary to the submission of questions, as is provided in Rules 277 and 279.

Tex. R. Civ. P. 67 (emphasis added). The party opposing the amendment bears the burden to show that it was prejudiced—that the amendment asserts a new cause of

44

action or defense or caused "surprise." *State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex. 1994); *Greenhalgh*, 787 S.W.2d at 939. An amended pleading that changes only the amount of damages sought does not necessarily operate as a surprise. *See Greenhalgh*, 787 S.W.2d at 940.

"A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim[,]" and "[w]hen there are no special exceptions, a petition will be construed liberally in favor of the pleader." *Roark v. Allen*, 633 S.W.2d 804, 809-10 (Tex. 1982). Where the facts are set up in the pleadings, and the cause of action as alleged is supported by the evidence, the measure of damages is a question of law for the court to determine. *See McDaniel Bros. v. Wilson*, 70 S.W.2d 618, 622 (Tex. App.—Beaumont 1934, writ ref'd); *see also Boswell v. Farm & Home Sav. Ass'n*, 894 S.W.2d 761, 771 (Tex. App.—Fort Worth 1994, writ denied); *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 834-35 (Tex. App.—Amarillo 1993, writ denied). "It is not necessary for a complainant to *allege* the measure of damages in order to recover damages." *Hedley Feedlot, Inc.*, 855 S.W.2d at 834; *see also Bowen v. Robinson*, 227 S.W.3d 86, 94 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) ("Under Texas law, a party is not required to plead his measure of damages."). "When a party erroneously alleges the measure of his damages, and the competent testimony reveals the proper measure, the court may charge the jury on the proper measure." *Bowen*, 227 S.W.3d at 95.

45

In their Third Amended Petition, the live petition when the trial began, the Brewers prayed for damages as follows:

> Pursuant to the Texas Civil Practice and Remedies Code and common law, the Brewers are entitled to recover actual damages; economic damages; consequential damages; compensatory damages; reasonable cost of repairs necessary to cure any construction defect; reasonable and necessary cost for the replacement of any damaged goods in the residence; reasonable and necessary engineering and consulting fees; reasonable expenses of temporary housing reasonably necessary during the repair period; reduction in current market value, if any, after the construction defect is repaired if the construction defect is a structural failure; mental anguish damages; reasonable and necessary attorneys' fees; court costs; exemplary damages; treble damages; pre-judgment interest; post-judgment interest; and all other relief to which the Brewers may be entitled.

In Plaintiffs' Fourth Amended Petition, the Brewers included the following prayer for relief (we have italicized that portion containing a change from the Third Amended Petition):

> Pursuant to the Texas Civil Practice and Remedies Code and common law, the Brewers are entitled to recover actual damages; economic damages; consequential damages; compensatory damages; reasonable costs of repairs necessary to cure any construction defect; reasonable and necessary cost for the replacement of any damaged goods in the residence; reasonable and necessary engineering and consulting fees; reasonable expenses of temporary housing reasonably necessary during the repair period; *diminution of value of their property and/or a reduction in the current market value of Unit 55, whether assessed at the time of the purchase of Unit 55 by the Brewers or at any time subsequent thereto;* mental anguish damages; reasonable and necessary attorneys' fees; court costs; exemplary damages; treble damages; pre-judgment interest; post-judgment interest; and all other relief to which the Brewers may be entitled.

46

Appellants do not claim that the Brewers asserted a new cause of action in their Fourth Amended Petition, but only that the Brewers pleaded a diminution in value of the property for the first time in this amended pleading. The Brewers' Third Amended Pleading requested damages for "reduction in current market value," with the qualifying clause, "if any, after the construction defect is repaired if the construction defect is a structural failure[.]"

As we have explained, a party need not plead a measure of damages provided its petition pleads sufficient facts from which the court may determine the proper measure of damages as a matter of law. *See McDaniel Bros.*, 70 S.W.2d at 622. The reworded measure of damages in the Fourth Amended Petition was raised by Todd Rotholz's testimony and report. *See id.* Defense counsel cross-examined Rotholz at trial, and nothing in the record show the defense was not prepared for his testimony or that the defense had not received Rotholz's report during discovery.[8] As far back as their Original Petition, which they filed in October 2017, the Brewers had prayed for damages that included but were not limited to the "[r]eduction in current market value" of their townhome after "the construction defect [in it had been] repaired if the construction defect [was due to] a structural failure[.]" Nothing in the record shows the Defendants filed special exceptions to the damages allegation in the Brewers' Third Amended Petition, so any defects as to damages in the allegations

---

[8] Rotholz's report is in the record and contains a bates-stamp.

47

are deemed to have been waived. *See* Tex. R. Civ. P. 90 (any defect in pleading that is not identified in a written special exception is deemed waived).

The record reflects that the trial court granted the Brewers leave to file their Fourth Amended Petition on July 16, 2021, at 3:43:50 p.m. The court signed the Final Judgment on July 16, 2021, at 3:46:30 p.m. Based on the record before use, we conclude that the trial court did not abuse its discretion in granting the Brewers leave to file the petition. *See Candelier*, 786 S.W.2d at 43. Additionally, Appellants have not met their burden to show surprise or prejudice, and they have not shown that the filing of the Fourth Amended Petition probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Greenhalgh*, 787 S.W.2d at 940. We overrule Appellants' fourth issue.

Exemplary Damages and Prejudgment Interest

Appellants' fifth issue argues that the trial court erred in submitting questions on exemplary damages to the jury and rendering a Final Judgment that awards exemplary damages because "there can be no exemplary damages [] if there are no actual damages."[9] Because we overruled Appellants' second and third issues on

---

[9] In their Statement Regarding Oral Argument, Appellants state that their fifth issue relates to "improper and incorrect instruction on corporate veil piercing[.]" To the extent Appellants intended to raise an issue related to corporate veil piercing, they have waived the issue for failure to brief it. *See* Tex. R. App. P. 38.1(i); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284-85 (Tex. 1994) ("error may be waived by inadequate briefing[]"); *Atkins-January v. State Office of*

48

actual damages, we also overrule the fifth issue. Appellants' sixth issue argues that the trial court erred in awarding prejudgment interest in the Final Judgment because the Brewers did not plead their claim for damages until after the trial court rendered its Final Judgment. We have already determined that the jury's responses to Question 13 and the Final Judgment awarding $67,500 damages based on the damages awarded by the jury were supported by sufficient pleadings and evidence. Therefore, we also overrule Appellants' sixth issue. *See* Tex. R. App. P. 47.1.

Having overruled all Appellants' issues, we affirm the trial court's Final Judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on January 25, 2023
Opinion Delivered July 27, 2023

Before Golemon, C.J., Horton and Johnson, JJ.

---

*Risk Mgmt.*, No. 09-16-00439-CV, 2017 Tex. App. LEXIS 7330, at \*\*3-5 (Tex. App.—Beaumont Aug. 3, 2017, no pet.) (mem. op.).